# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JACK WILKINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2017-0138-VCL |
| | ) | |
| A. SCHULMAN, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: November 8, 2017
Date Decided: November 13, 2017

Michael Van Gorder, FARUQI & FARUQI, LLP, Wilmington, Delaware; Amy Miller, Christopher J. Kupka, LEVI & KORSINSKY, LLP, New York, New York; *Attorneys for Plaintiff.*

Stephen C. Norman, Tyler J. Leavengood, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Anthony J. O'Malley, VORYS, SATER, SEYMOUR & PEASE LLP, Cleveland, Ohio; *Attorneys for Defendant.*

**LASTER, V.C.**

By letter dated August 19, 2016, plaintiff Jack Wilkinson sought to inspect specified categories of books and records of defendant A. Schulman, Inc. (the "Company"). Section 220 of the Delaware General Corporation Law authorizes such a request. It states, in pertinent part:

> Any stockholder, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose, and to make copies and extracts from: (1) The corporation's stock ledger, a list of its stockholders, and its other books and records . . . .[1]

The statute defines a "proper purpose" as "a purpose reasonably related to such person's interest as a stockholder."[2]

> Wilkinson's demand letter identified four purposes for the requested inspection:
>
> (i) To investigate potential wrongdoing, mismanagement, breaches of fiduciary duties and/or waste of corporate assets by the members of A. Schulman's Board of Directors (the "Board"), or others related to the issues discussed below;
>
> (ii) To assess the ability of the Board to consider impartially a demand for action (including a request for permission to file a derivative lawsuit on the Company's behalf) related to the items described in this demand;
>
> (iii) To take appropriate action in the event the members of the Board did not properly discharge their fiduciary duties, including the preparation and filing of a stockholder derivative lawsuit or the sending of a litigation demand letter, if appropriate; and
>
> (iv) To discuss with the Board and/or management proposed reforms to prevent any future wrongdoing or mismanagement related to the issues discussed below.[3]

---

[1] 8 *Del. C.* § 220(b).

[2] *Id.*

1

The "issues discussed below" involved a decision by the Board to accelerate the vesting of 111,365 shares of restricted stock for the Company's President and Chief Executive Officer, Joseph M. Gingo, when he retired effective December 31, 2014.

The demand explained that, under one reasonable reading of Gingo's employment agreement, Gingo only was entitled to *pro rata* vesting of the shares over time.[4] Based on the amount of time that had elapsed between the grants and his retirement, he could receive a maximum of 111,365 shares. By accelerating the vesting for all unvested shares, the Board caused an additional 107,775 shares to vest, worth over $3.9 million. The demand contended credibly that (i) the shares were performance awards under the terms of a stockholder-approved equity compensation plan and (ii) accelerating the vesting of the shares based on the fact of Gingo's retirement violated the requirements for performance awards under the plan.[5]

The demand articulated harm to the Company as a result of the Board's decision, including the loss of favorable tax treatment under Section 162(m) of the Internal Revenue Code. The demand further observed that, when explaining its rationale for

---

[3] Compl., Exh. A.

[4] *See* PX 1 at 19-20 (stating that vesting only was permitted "on a pro rata basis for the period of time then elapsed" and "only if the performance criteria described in the awards are satisfied at the end of the applicable performance period").

[5] *See* PX 2 art. XII (stating that "in no event shall [awards] intended to constitute 'qualified performance-based compensation' under Section 162(m) of the Internal Revenue Code be settled or become exercisable in full, upon the termination of employment of the Covered Employee without regard to the satisfaction of the related Performance Criteria").

2

accelerating all of Gingo's shares, the Board referred only to the past services that Gingo had provided to the Company. Because Gingo already had been compensated for those services, and because the Board did not identify any consideration that Gingo provided for the additional shares, the demand posited that there was a credible basis to suspect that the full acceleration could be attacked as corporate waste. The demand also posited that the directors who approved the acceleration could have been serving Gingo's interest rather than the Company's, giving rise to a credible basis to suspect a breach of the duty of loyalty.

By letter dated September 1, 2016, the Company rejected the demand in its entirety. By letter dated September 23, Wilkinson's primary counsel, Levi & Korsinksy LLP ("L&K"), followed up on the demand. By letter dated October 12, the Company again rejected the demand in its entirety.

Wilkinson filed suit on February 22, 2017. The parties engaged in discovery, and Wilkinson was deposed. A trial was held on a stipulated paper record.

At trial, the Company argued that Wilkinson should not be entitled to an inspection because the purposes articulated in the demand were not Wilkinson's actual purposes. "The paramount factor in determining whether a stockholder is entitled to inspection of corporate books and records is the propriety of the stockholder's purpose in seeking such inspection."[6] "In a section 220 action, a stockholder has the burden of proof

---

[6] *CM & M Gp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982).

to demonstrate a proper purpose by a preponderance of the evidence."[7] "The mere statement of a proper purpose, however, will not automatically satisfy § 220(b)."[8] "A corporate defendant may resist demand where it shows that the stockholder's stated proper purpose is not the actual purpose for the demand."[9] "Such a showing is fact intensive and difficult to establish . . . ."[10]

In this case, the trial record established that the purposes for the inspection belonged to Wilkinson's counsel, L&K, and not to Wilkinson himself. Wilkinson simply lent his name to a lawyer-driven effort by entrepreneurial plaintiffs' counsel.

Wilkinson admitted that the purposes for inspection articulated in the demand letter were not his purposes and that L&K came up with each of them.[11] Wilkinson similarly admitted that L&K identified each of the categories of books and records that

---

[7] *Seinfeld v. Verizon Commc'ns Inc.*, 909 A.2d 117, 121 (Del. 2006); *accord Thomas & Betts Corp. v. Leviton Mfg. Co., Inc.*, 681 A.2d 1026, 1031 (Del. 1996) ("When a stockholder seeks inspection of books and records, the burden of proof is on the stockholder to demonstrate that his purpose is proper.").

[8] *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 817 (Del. Ch. 2007).

[9] *Id.*; *accord Cook v. Hewlett-Packard Co.*, 2014 WL 311111, at *3 (Del. Ch. Jan. 30, 2014) (explaining that "[i]n order for a purpose to be 'proper,'" it must be "the plaintiff's actual purpose"); *Sutherland v. Dardanelle Timber Co.*, 2006 WL 1451531, at *8 (Del. Ch. May 16, 2006) ("A defendant facing a Section 220 action may resist that demand by showing that the plaintiff's purpose, although a valid one, is not the actual purpose. In other words, the defendant may try to show that the plaintiff has pursued its claim under false pretenses." (footnote omitted)); *see also Thomas & Betts*, 681 A.2d at 1034 (affirming Court of Chancery's finding that stockholder had "failed to demonstrate that [its articulated purpose] is the actual purpose for the information sought").

[10] *Pershing Square*, 923 A.2d at 817.

[11] Wilkinson Dep. at 117.

4

the demand sought to inspect.[12] Consistent with Wilkinson's testimony, the L&K attorney defending his deposition objected to questions exploring the purposes recited in the demand or how the categories of information related to the stated purposes, arguing that Wilkinson should not be asked about them because "[h]e's already testified that he didn't come up with these things."[13]

This is not a situation in which the stockholder client initiated the process, then counsel drafted a demand. The event that prompted Wilkinson to seek books and records differed substantially from what L&K chose to explore. Wilkinson testified that he was unhappy with how the Company has performed financially, and he decided to pursue a books and records inspection after the Company announced negative financial results.[14] As he put it, "[t]hey lost $365 million, which is a pretty good reason, don't you think?"[15] L&K, by contrast, chose to investigate the Board's decision to accelerate Gingo's equity awards when he retired in 2014. Wilkinson testified that he is not aware of any facts suggesting wrongdoing, mismanagement, or waste relating to the compensation decision in 2014.[16]

After signing the demand, Wilkinson was not involved in L&K's effort to obtain documents. He did not review the Company's response, L&K's follow-up letter, or the

---

[12] Wilkinson Dep. at 104.

[13] Wilkinson Dep. at 105, 106-13.

[14] Wilkinson Dep. at 79.

[15] Wilkinson Dep. at 79.

[16] Wilkinson Dep. at 98-99.

5

Company's further response.[17] He was not even sure that the Company and his counsel communicated about the demand.[18]

After the Company made clear that it would not produce any information without litigation, L&K prepared a complaint.[19] At this point, L&K contacted Wilkinson to get his signature on the verification. Wilkinson did not take any steps to confirm the accuracy of the allegations in the complaint; he simply verified the pleading in reliance on counsel.[20] He did not review the Company's answer.[21] When the Company served interrogatories, Wilkinson did not participate in drafting the responses. Once again, he simply verified what counsel wrote. The responses stated that the persons most knowledgeable about the purposes in the demand were lawyers at L&K, not Wilkinson.[22] During his deposition, Wilkinson confirmed that fact.[23]

---

[17] Wilkinson Dep. at 87-88, 120-21.

[18] Wilkinson Dep. at 124-25 ("Q. Do you know why you waited several months to file the complaint? A. No. I don't know why they would have. Q. Did you have any discussions with your counsel about why it was taking so long to file the complaint? [Objection] A. Not to my recollection. I don't know. I mean, I don't -- I don't know if I did or not.").

[19] *See* DX 16.

[20] Wilkinson Dep. at 124 ("Q. What[] steps, if any, did you take to verify the allegations in the complaint? A. I was relying on counsel's expertise.").

[21] Wilkinson Dep. at 130 ("Q. You don't recall having discussions with your counsel about the company's answer, do you? A. No. No particular conversation. I can't remember.").

[22] DX 18 at 7 (stating that "his counsel are the persons most knowledgeable with respect to the Demand and the Complaint").

[23] Wilkinson Dep. at 100.

Wilkinson's service as a nominal plaintiff for L&K in this action is consistent with his past relationship with the firm. Wilkinson has served as a plaintiff for L&K in at least seven lawsuits, most of which challenged mergers.[24] Wilkinson did not do anything to verify the factual allegations in those lawsuits, other than to read the complaints that L&K drafted.[25] He agreed to serve as a plaintiff reflexively after seeing the press releases L&K issued announcing investigations into the transactions.[26] He let L&K file the suits because he wanted more money for his shares, regardless of whether the deal price was fair.[27] Wilkinson never received a dime of additional consideration.[28] Most, if not all, of the cases settled for supplemental disclosures.[29]

A stockholder obviously can use counsel to seek books and records. Section 220 expressly contemplates that a stockholder can make a demand "in person or by attorney or other agent."[30] Indeed, given the complexity of Delaware's sprawling Section 220 jurisprudence, a stockholder is well-advised to secure counsel's assistance. But a stockholder seeking an inspection and retaining counsel to carry out the stockholder's

---

[24] *See* DX 1-DX 7.

[25] Wilkinson Dep. at 41, 44, 52, 57, 60-62.

[26] *See, e.g.*, Wilkinson Dep. at 41, 55, 58.

[27] Wilkinson Dep. at 54-55, 60, 64.

[28] Wilkinson Dep. at 36, 42, 45, 47, 49, 53, 56, 58, 62.

[29] Wilkinson Dep. at 49, 53, 58.

[30] 8 *Del. C.* § 220(b).

wishes is fundamentally different than having an entrepreneurial law firm initiate the process, draft a demand to investigate different issues than what motivated the stockholder to respond to the law firm's solicitation, and then pursue the inspection and litigate with only minor and non-substantive involvement from the ostensible stockholder principal. On the record presented in this case, the Company proved that Wilkinson's purported purposes were not his actual purposes. They were his counsel's purposes.

A stockholder who lacks a proper purpose is not entitled to inspect books and records. Judgment is entered in favor of the Company. Each side will bear its own costs.