# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DAVID MYERS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-0241-BWD |
| | ) | |
| ACADEMY SECURITIES, INC, | ) | |
| | ) | |
| Defendant. | ) | |

## POST-TRIAL FINAL REPORT

Final Report: July 27, 2023
Date Submitted: July 24, 2023

T. Brad Davey and Ryan M. Ellington, of POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; OF COUNSEL: Brendan F. Quigley, of BAKER BOTTS LLP, New York, New York, *Attorneys for Plaintiff David Myers*.

Kevin M. Gallagher and Nicole Henry, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Michael T. Dyson, of SULLIVAN & WORCESTER LLP, Washington, D.C.; Christopher K. Shields, of SULLIVAN & WORCESTER LLP, New York, New York, *Attorneys for Defendant Academy Securities, Inc*.

**DAVID, M.**

Through this action, plaintiff David Myers ("Plaintiff") seeks an order to compel the inspection of books and records of defendant Academy Securities, Inc. ("Academy," or the "Company") pursuant to Section 220 of the Delaware General Corporation Law ("DGCL").

Academy is a veteran owned and operated investment bank incorporated in Delaware. In 2014, Plaintiff, a combat-wounded Marine veteran and Purple Heart recipient, joined Academy as its Director of Business Development. When Plaintiff expressed interest in owning equity in the Company, Academy's management team facilitated Plaintiff's purchase of 17,621 shares of Academy common stock— roughly 5% of the then-outstanding equity—from a former Academy employee.

Six years later, in early 2020, Plaintiff resigned from Academy and sought to exit his investment through a share redemption or sale to a third party. When Plaintiff requested additional financial information to value his shares, Academy refused, and discussions became contentious. Then, in March 2022, Academy sent Plaintiff a letter purporting to cancel his shares, claiming that Plaintiff had breached his fiduciary duties as a stockholder and the terms of a March 2020 separation agreement with the Company.

In February 2023, Plaintiff served a demand on Academy pursuant to Section 220, seeking to inspect books and records to value his shares and to determine whether Academy has had stockholder meetings for which Plaintiff did not receive

1

notice. Academy rejected the demand on the grounds that Plaintiff's separation agreement had "released" Plaintiff's shares or, alternatively, that his shares had been canceled, such that Plaintiff was no longer a stockholder with standing to seek books and records.

At trial, Academy abandoned its initial arguments for rejecting the demand. It concedes that Plaintiff, as a minority stockholder, never owed fiduciary duties to the Company. And it no longer asserts that Plaintiff's separation agreement "released" Plaintiff's shares or rights under Section 220. Now, Academy claims that Plaintiff's shares were canceled in October 2022 for failure to repay a "subscription receivable" encumbering his shares. The purported subscription receivable is not memorialized in writing, as required by Delaware law. The former employee from whom Plaintiff purchased his shares previously rejected Academy's attempt to assert the existence of an unwritten subscription receivable without his knowledge or consent. Yet Academy sought to do the same to Plaintiff, using the subscription receivable as a *post hoc* litigation tactic to justify its cancellation of Plaintiff's shares without informing Plaintiff of his purported debt, let alone complying with statutory procedures governing the assessment and collection of unpaid subscriptions for stock. Academy should not have forced the parties to litigate this defense.

In this post-trial final report, I conclude that Plaintiff has standing to seek books and records; has stated proper purposes for inspection, which are his actual,

2

primary purposes for making the demand; and is entitled to most of the documents he seeks.  I also recommend that, consistent with this Court's guidance in *Pettry v. Gilead Sciences, Inc.*,[1] Plaintiff should be granted leave to brief his request for attorneys' fees and costs incurred in connection with this action.

## I.    BACKGROUND

The following facts are drawn from the factual stipulations in the parties' pre-trial order, the deposition testimony of two witnesses that was submitted in lieu of live testimony at trial, and 211 joint trial exhibits.[2]

### A.    The Parties

Academy is a privately held Delaware corporation that markets itself as "our nation's first post-9/11 veteran-owned and operated investment bank."[3]  Academy's website promotes the Company as a "California Certified Disabled Veteran Business Enterprise (DVBE) and Verified Federal Service-Disabled Veteran-Owned Business (SDVOB)," professing that "[d]oing business with a veteran-owned investment bank like Academy helps municipal debt issuers, investment management firms, public, corporate, multi-employer pension funds, and other public and private entities fulfill

---

[1] 2020 WL 6870461, at *9 (Del. Ch. Nov. 24, 2020), *judgment entered*, (Del. Ch. 2020).

[2] The Stipulation and Pre-Trial Order is cited as "PTO ¶ __".  The deposition testimony of Plaintiff and Academy's Rule 30(b)(6) witness, Anthony Graham, is cited as "Myers Dep. at __" and "Graham Dep. at __", respectively.  *See* Dkt. 68, Ex. A, B.  The joint trial exhibits are cited as "JX __".

[3] PTO ¶ 3.

their Veteran, DVBE, SDVOSB and MBE goals and mandates."[4] Academy's management team includes (or has included at relevant times) Chance Mims, the Company's founder, Chief Executive Officer, Chairman of the Board, and 51% owner; Anthony Graham, its Chief Financial Officer and Chief Operating Officer; and Philip McConkey, its President.

Plaintiff served as Academy's Director of Business Development from September 15, 2014 until March 25, 2020. Plaintiff purchased 17,621 shares of Academy common stock (the "Shares") from non-party Shane Osborn, a former Academy employee, in 2014.

## B. Academy Issues Shares To Its Former Chief Marketing Officer, Shane Osborn.

Academy issued the Shares to Osborn in 2012 while he was serving as the Company's Chief Marketing Officer. According to Academy, the Shares were issued subject to a "subscription receivable." Although Academy has no record of a written agreement memorializing the subscription receivable,[5] it asserts that Osborn was granted the right to "purchase and own" the Shares at a subscription price of $8.89 per share, for a total of $156,650.69, and in exchange, Osborn (or any

---

[4] *Id.* ¶ 4.

[5] *Id.* ¶ 33 ("Academy cannot find any written agreement reflecting a subscription receivable between (i) Academy, on the one hand, and (ii) Mr. Osborn or Mr. Myers, on the other."); Graham Dep. at 31.

4

transferee of the Shares) became obligated to repay the subscription receivable at the call of the Company.[6]

Osborn resigned from Academy on June 11, 2014. At that time, Doug Greenwood, the Company's former Chief Operating Officer, asked Mims and Graham what Osborn's resignation "mean[t] for his shares / subscription receivable?"[7] Graham suggested Academy's management team "game plan how we handle these shares."[8]

Two weeks later, on June 27, 2014, at 12:32 p.m., Osborn wrote to Mims: "You told me the shares are worth $8.50 per share and that you have investors looking for equity in Academy Securities" and "I am willing to sell my holdings to any willing investor at that price."[9] At 6:00 p.m., Graham emailed Mims and Greenwood, informing them that Academy "has maintained a subscription receivable for [$8.89 per share] awaiting repayment from Mr. Osborn, which will have to be written off upon his resignation if he is unwilling to pay for these shares."[10] At 6:19 p.m., Mims wrote to Osborn: "I think the right thing for you to

---

[6] Def. Academy Securities, Inc.'s Opening Pretrial Br. [hereinafter, "DOB"] at 4, Dkt. 57.

[7] JX 7.

[8] *Id*.

[9] JX 9.

[10] JX 8.

do is give them back, but that's up to you. The shares that were given to you were worth $8.89 . . . ."[11]

## C. Plaintiff Purchases The Shares From Osborn.

In August 2014, Plaintiff accepted an offer to join Academy as Director of Business Development. At the time, Plaintiff told McConkey, whom he had known for approximately a decade, that he was interested in owning shares of Academy.[12] Academy introduced Plaintiff to Osborn and continued "[t]o help facilitate" Plaintiff's purchase of the Shares.[13]

On September 26, 2014, at 7:17 a.m., Osborn forwarded Mims an email from an accountant advising Osborn that:

- Companies cannot make or lose money on their own stock transactions.
- There are no written agreements to show that you purchased the stock in question.
- The company set up a subscription receivable without your knowledge or consent.
- The company cannot make up a false deduction for a so-called bad debt on the subscription receivable.
- Again, the best way to correct the situation is to simply reverse the original entry, no gain or loss to the company or to you.
- The research doesn't cover a company selling its own stock. If they continue to pursue the insistence of issuing a 1099, and trying to get a tax deduction for the company, and improperly

---

[11] JX 9.

[12] PTO ¶ 10.

[13] *Id*. ¶¶ 11, 13; Graham Dep. at 34. *See also, e.g.*, JX 17; JX 18.

forcing phantom income on you; I suggest that you notify the IRS and provide the facts to them.[14]

At 10:40 a.m., Mims forwarded Osborn's email to Graham and Greenwood.[15] Five minutes later, Greenwood wrote to Mims and Graham, "I'm sure that I explained the subscription receivable to [Osborn] . . . but unfortunately don't have documentation."[16] One minute after that, Mims wrote to Graham and Greenwood, "I just spoke to [Osborn], I think he is going to sell the shares."[17]

That afternoon, at 2:54 p.m., Osborn emailed Mims a copy of an agreement, executed by Osborn, providing that Plaintiff would purchase the Shares from Osborn for $4.36 per share, or a total of $76,827.56 (the "Sale Agreement").[18] The Sale Agreement, which made no reference to a subscription receivable, warranted that Osborn "is the sole owner of the shares and there are no liens or encumbrances thereon and is not aware of anything that would interfere with the transfer of the Shares and [Plaintiff] pursuant hereto."[19] At 3:55 p.m., Mims forwarded Osborn's execution copy of the Sale Agreement to Plaintiff.[20]

---

[14] JX 25.

[15] *Id.*

[16] JX 26.

[17] JX 27.

[18] PTO ¶ 15; JX 31.

[19] JX 32.

[20] *Id.*

7

On September 29, 2014, Mims emailed Plaintiff identifying information for Osborn's company to facilitate Plaintiff's payment for the Shares.[21] On October 6, 2014, Plaintiff wired payment for the Shares directly to Osborn,[22] and on October 8, 2014, Plaintiff faxed an executed copy of the Sale Agreement to Osborn.[23]

On November 14, 2014, Graham sent Academy's consultant the following "[s]ummary of what we talked about before, so we can let it marinate":

- Shane Osborn was granted shares 2 years ago vs a subscription receivable . . . .
- This past summer, [Osborn] left the firm and attempted to return his remaining shares to Academy. Our CPA's shot this down, saying we can't simply undue the transaction by him returning the shares because it happened in a prior tax year. We'd have to buy them back, which we could not do[.]
- Our new employee, [Plaintiff], expressed interest in the shares to [Osborn] and they concluded a transaction between them for the remaining shares.
- We have a subscription receivable on the books that is technically from an employee no longer with the firm, unwilling to pay the receivable . . . .

For discussion / What to do /
- Write off the receivable? This comes with the obvious downside of a large loss on our books[.]
- Write off the receivable from [Osborn], add a new receivable from [Plaintiff], so the effect on our books is neutral?[24]

---

[21] PTO ¶ 17.

[22] JX 45.

[23] JX 44.

[24] JX 49.

**D. The Board Authorizes Cancellation Of Unspecified Shares Subject To Subscription Receivables.**

Two years later, on December 14, 2016, Academy's board of directors unanimously adopted a resolution (the "Board Resolution"), which stated that "a number of stockholders have not paid the par value under [their] Subscription Receivable and/or may otherwise be delinquent under their Subscription Agreements," and resolved:

> that the proper officers of [Academy] are authorized and directed to take such further steps, including, without limitation, demanding immediate payment of any amount due under the applicable Subscription Agreement and/or termination or cancellation of such stockholder's Subscription Receivable and demanding the return of such stockholder'[s] shares of capital stock, and execute and deliver such further documents, as such officers, with the advice of counsel, may deem necessary or desirable to carry out the transactions contemplated by these resolutions.[25]

The Board Resolution does not identify the shares subject to cancellation or make any specific reference to Plaintiff or the Shares, nor does it cite Sections 163 or 164 of the DGCL governing assessment and collection of unpaid subscriptions for stock. Academy did not demand payment of a subscription receivable from Plaintiff after the Board Resolution was adopted.[26]

---

[25] JX 61.

[26] Graham Dep. at 79 ("Q. Fair to say Academy did not demand immediate payment of any purported subscription receivable from Mr. Meyers in 2016? A. That's correct.").

## E. Plaintiff Leaves Academy And Executes A Separation Agreement.

In early 2020, Plaintiff resigned from his position at Academy, effective March 25, 2020. As of that date, Plaintiff and Academy executed a separation agreement (the "Separation Agreement"). The Separation Agreement includes a release of claims:

> arising out of or by reason of any cause, matter or thing whatsoever, whether known or unknown, from the beginning of the world to the Effective Date hereof, under which [Plaintiff] ever had, now has or may hereafter have against [Academy], including those arising out of any act, omission, transaction or event occurring prior to or as of the Effective Date including, without limitation, those related to [Plaintiff's] employment by [Academy], [and] the termination of his employment . . . .[27]

After executing the Separation Agreement, Academy continued to acknowledge that Plaintiff remained a stockholder of the Company.[28]

## F. Plaintiff Requests Valuation Information While He Tries To Sell His Shares.

Throughout late 2020 and 2021, Plaintiff tried to exit his investment in Academy through a share redemption by the Company or a sale to a third party.[29] Over several months, Plaintiff had numerous discussions with Academy about

---

[27] JX 69, Separation Agreement § 3.

[28] *See, e.g.*, JX 87; JX 106; JX 118; JX 151.

[29] PTO ¶ 24.

selling the Shares, and the Company never told Plaintiff that it believed the Shares were subject to a subscription receivable.[30]

On January 7, 2021, Plaintiff emailed Graham and McConkey, thanking them for a "verbal offer for my 17,621 common shares of academy securities Inc. that I purchased on 26 Sept, 2014 for a then ownership percentage of 5.53%."[31] "In order to evaluate a fair market value of [his] shares," Plaintiff requested that Academy provide him with financial statements, a summary of operations, and a balance sheet.[32] Plaintiff's father, John Myers, wrote in a subsequent email: "I'm helping [Plaintiff] evaluate a fair value and we had no current financial info to review. I don't know how many other minority shareholders you have but there should be a process to keep them informed about their investment."[33]

In response, Graham sent Plaintiff materials that had been provided to Academy preferred stockholders in connection with a November 2020 preferred share redemption.[34] Those documents included an audited financial statement for 2019; a "2020 Year to Date Review" update; a board consent and term sheet for the

---

[30] Graham Dep. at 80.

[31] JX 98.

[32] *Id.*

[33] JX 100.

[34] JX 104.

redemption; a profit-and-loss statement for the period January 1, 2020 through September 30, 2020; and a balance sheet as of September 30, 2020. [35]

On February 1, 2021, Graham emailed Plaintiff, explaining that "the direct sale of shares to a third party is subject to approval of the buyer by Academy's management," but that an Academy employee, Spencer Wilcox, had "indicated interest in purchasing common stock and would be open to a conversation with interested sellers."[36] On February 5, 2021, Graham told Plaintiff that "Academy [wa]s not conducting a partial redemption of the common shares at this time" but "w[ould] keep [Plaintiff] updated as we hear of any additional interested buyers that would be categorized as arm's length transactions."[37]

Wilcox subsequently contacted Plaintiff about his interest in purchasing the Shares. To inform those discussions, Plaintiff and his father asked Academy to provide periodic financial statements, a balance sheet, and information about Academy's operations, but the Company refused to provide additional valuation information.[38]

---

[35] *Id.*

[36] JX 106.

[37] JX 108.

[38] *See, e.g.*, JX 131.

## G. The Proton Emails

In April 2021, Academy clients and employees, as well as others in the financial services industry, received emails from three anonymous Proton Mail[39] accounts claiming that Academy "was founded by a veteran who is a fraud" and urging employees to leave the Company.[40] Believing Plaintiff to have authored those emails, on April 29, 2021, Academy's counsel sent Plaintiff a letter accusing him of defaming the Company in violation of a non-disparagement clause in the Separation Agreement.[41] On May 4, 2021, Plaintiff responded to Mims and McConkey directly by email, stating that he "was surprised and disturbed to receive a letter from a law firm representing Academy which appears to allege that I violated my separation agreement by disparaging Academy" and that "[a]ny such allegations are false."[42]

---

[39] "Proton Mail is a private email service that uses open source, independently audited end-to-end encryption and zero-access encryption to secure [its users'] communications." https://proton.me/mail (last visited July 27, 2023).

[40] JX 136; JX 138; JX 139. *See also* PTO ¶ 27. The emails were sent from 1PHArmyRanger1776@protonmail.com, KunarArmyRangerPurpleHeart@protonmail.com, and PatriotOverwatch@protonmail.com.

[41] JX 140.

[42] JX 142.

## H. Academy Purports To Cancel The Shares.

On March 30, 2022, Academy's counsel sent a letter to Plaintiff claiming that Academy was "cancelling [Plaintiff's] 17,621 shares of Academy common stock" because Plaintiff had "breached: (i) his fiduciary duties that he owes to Academy as a shareholder in a closely held corporation; and (ii) the terms of his Separation Agreement . . . ."[43] The letter did not mention a subscription receivable. Plaintiff, through counsel, responded on April 5, 2022, asserting that the purported cancellation was "based on frivolous legal positions"—including because Plaintiff, as a minority stockholder, did not owe fiduciary duties to Academy—and was also "unsupported by the facts."[44]

More than six months later, on October 17, 2022, Academy purportedly canceled the Shares on its books, wrote off the subscription receivable, and removed Plaintiff's name from the Company's stock ledger. Academy claimed in its official journal sent to outside auditors that Plaintiff had "return[ed]" the Shares,[45] and Graham informed an outside consultant helping Academy prepare reports that it had "received back 17,621 shares that [Plaintiff] owned as part of a legal agreement."[46]

---

[43] JX 163, Ex. 2.

[44] JX 158.

[45] JX 167. Graham testified, however, that Plaintiff "did not return the shares" to Academy "[b]efore [it] cancelled the shares." Graham Dep. at 67.

[46] Graham Dep. at 71.

**I.** **Academy Fails To Provide Plaintiff With Notice Of Redemption Offers.**

On December 1, 2021, Academy announced a partial redemption of a minimum of 13,072 shares of Academy common stock at a price of $11.50 per share.[47] Plaintiff did not receive notice of the redemption.

On November 15, 2022, Academy announced another partial redemption of a minimum of 48,052 shares of Academy common stock at a price of $13 per share.[48] Plaintiff did not receive notice of that redemption, either.

**J.** **Plaintiff's Employment After Academy**

A June 14, 2023 BrokerCheck report reflects that Plaintiff has been "employed by and registered with" Blue Ocean ATS, LLC ("Blue Ocean") in the position of "Institutional Sales" since November 2021 through the "Present."[49] Plaintiff testified that he has never been employed by, but has provided strategic advice to, Blue Ocean.[50] The Company asserts that Blue Ocean is a competitor of Academy; Plaintiff disagrees.

---

[47] JX 157 at 10.

[48] JX 170 at 12.

[49] JX 201.

[50] Myers Dep. at 29.

In early 2022, Plaintiff began working at Palantir Technologies ("Palantir"), where he is currently employed.[51] The parties agree that Palantir does not compete with Academy.[52]

### K. The Demand

On February 1, 2023, Plaintiff served a demand on the Company pursuant to 8 *Del. C.* § 220 (the "Demand"), seeking to inspect eleven categories of books and records of the Company "(1) to assist [Plaintiff] in ascertaining the value of his shares of Academy, and (2) to determine whether Academy has had meetings of stockholders for which [Plaintiff] was not provided notice, the business conducted at any such meetings, whether any such meetings are currently scheduled, and whether any such meetings that have occurred were conducted in accordance with and notice provided to Academy's stockholders in accordance with Delaware law, Academy's bylaws, and any rules or procedures implemented by Academy's board of directors."[53]

The documents sought in the Demand include:

- All financial statements (whether audited, pro forma, or otherwise), presented to or approved by Academy's Board of Directors (the "Board") or any committee thereof,

---

[51] PTO ¶ 29.

[52] *Id.*

[53] JX 162, Demand at 1.

16

including any income statement and any balance sheet for Academy Securities for 2018, 2019, 2020, 2021, and 2022;

- All financial reports or summaries of Academy that were provided to Academy's Board or any committee thereof from January 31, 2018 to the present;

- All versions of Academy's capitalization table from January 31, 2018 through the present;

- A listing of all capital distributions, dividends, or similar payments to stockholders, lenders, or other investors between January 31, 2018 and the present, along with any board resolutions related to those transactions;

- The results of Academy's "Redemption Offer" dated December 1, 2021, including information showing how many shares were redeemed and as a result what is the current number of shares outstanding in order to determine [Plaintiff's] present ownership;

- Documents, correspondence, and reports concerning any interested-party transactions, including any transactions, contracts, agreements, or arrangements between (i) Academy on the one hand and (ii) any director, officer, employee, or stockholder of Academy or any of their immediate family members, associates, or any entity owned, operated, or controlled by any such director or officer or their immediate family members or associates, including but not limited to Academy Asset Management, on the other;

- All materials created for or provided to the Board or any committee thereof from January 31, 2018 to the present concerning compensation or remuneration for directors, officers or managers of the company, including the total amount of compensation actually paid or to be paid to any such director or officer, and any employment or consulting agreement executed in connection therewith;

17

- A list of Academy stockholders and Academy's stock ledgers as of January 1, 2022; June 1, 2022; and January 1, 2023;

- Copies of any rules or regulations adopted by Academy's Board of Directors for the conduct of shareholder meetings;

- Any notices to stockholders of Academy of annual or special meetings of stockholders and the agendas and minutes of any such meetings; and

- The current bylaws of Academy.[54]

On February 8, 2023, Academy rejected the Demand on the grounds that the Separation Agreement had "released" Plaintiff's Shares and, alternatively, that the Shares had been canceled.[55] Academy's February 8 response letter made no mention of a subscription receivable.

On February 24, 2023, Plaintiff filed his Verified Complaint Pursuant to 8 *Del. C.* § 220 to Compel the Inspection of Books and Records (the "Complaint"). This action was reassigned to me on May 9, 2023. A one-day trial on a paper record was held on July 24, 2023.

## II. ANALYSIS

"To inspect books and records under Section 220, a plaintiff must establish by a preponderance of the evidence that the plaintiff is a stockholder, has complied

---

[54] *Id.* at 2-3.

[55] JX 163.

18

with the statutory form and manner requirements for making a demand, and has a proper purpose for conducting the inspection." *Pettry v. Gilead Scis., Inc.*, 2020 WL 6870461, at *9 (Del. Ch. Nov. 24, 2020), *judgment entered*, (Del. Ch. 2020). "If a stockholder meets these requirements, the stockholder must then establish 'that each category of the books and records requested is essential and sufficient to the stockholder's stated purpose.'" *Id.*

Academy's primary defense in this action is that Plaintiff is no longer a stockholder with standing to obtain books and records because the Company canceled his Shares. That argument fails on the facts and the law. Academy also contends that Plaintiff has not demonstrated a proper purpose; Plaintiff's stated purposes are pretexts to obscure his actual purpose to harm the Company; and the scope of the Demand is overbroad. In large part, these arguments also fail, and Plaintiff is entitled to most of the books and records sought in the Demand.

### A. Plaintiff Is Still A Stockholder With Standing To Demand Books And Records.

Under Section 220, a plaintiff must first establish that she "is a stockholder"—or was at the time the complaint was filed. 8 *Del. C.* § 220(c)(1); *Weingarten v. Monster Worldwide, Inc.*, 2017 WL 752179, at *3 (Del. Ch. Feb. 27, 2017) ("Section 220 requires that a plaintiff own stock when the Section 220 complaint is filed."). The statute defines a stockholder as "a holder of record of stock in a stock corporation, or a person who is the beneficial owner of shares of such stock held

19

either in a voting trust or by a nominee on behalf of such person."  8 *Del. C.* § 220(a)(1).

To demonstrate Plaintiff's status as a stockholder of record, the Demand attached a stock certificate reflecting Plaintiff's ownership of 17,621 shares of Academy common stock.[56]  Academy concedes that Plaintiff *was* a stockholder, but claims that the Company validly canceled his Shares for nonpayment of a subscription receivable and removed Plaintiff's name from its stock ledger.[57]

The Company's standing defense is meritless and, in my view, Academy should not have pressed it as a basis to resist the Demand.  Academy asserts that when the Shares were initially granted to Osborn in 2012, they were "made subject to a subscription receivable" pursuant to which Osborn was obligated to repay "$8.89 per share in order to complete the purchase" of the Shares.[58]  But Academy concedes that the purported subscription receivable was not memorialized in writing,

---

[56] JX 162, Demand at Ex. 1.

[57] Academy does not argue that the Court should defer to the Company's stock ledger in assessing Plaintiff's standing.  *See Knott Partners L.P. v. Telepathy Labs, Inc.*, 2021 WL 5493092, at *5-6 (Del. Ch. Nov. 23, 2021) (holding that a corporation could not rely on a deficient ledger it controlled to deprive the stockholder of its inspection rights).  *See also Myers v. Academy Securities, Inc.*, C.A. No. 2023-0241-BWD, at 41-44 (Del. Ch. May 15, 2023) (TRANSCRIPT) (explaining that "the equities support targeted discovery into the company's standing defense, which I do expect should largely turn on contract interpretation, such as the scope of the release in the separation agreement and the company's ability to cancel shares under a subscription agreement").

[58] DOB at 17.

20

as required by Delaware law.[59]  In lieu of a written agreement evidencing the subscription, Academy relies almost exclusively on correspondence from 2014, following Osborn's resignation from the Company, in which *Osborn rejected Academy's attempt to assert the existence of an unwritten subscription receivable without his knowledge or consent*.  Namely, on June 11, 2014, Greenwood asked Mims and Graham what Osborn's resignation "mean[t] for his shares / subscription receivable," and Graham proposed that the Company "game plan how we handle these shares."[60]  Two weeks later, Graham told Mims and Greenwood that Osborn's subscription receivable would "have to be written off upon his resignation if [Osborn] [wa]s unwilling to pay for these shares,"[61] and Mims urged Osborn that "the right thing . . . to do is give [the Shares] back, but that's up to you."[62]  Osborn's

---

[59] *See* 8 *Del. C.* § 166 ("A subscription for stock of a corporation, whether made before or after the formation of a corporation, shall not be enforceable against a subscriber, unless in writing and signed by the subscriber or by such subscriber's agent."); *Grimes v. Alteon, Inc.*, 804 A.2d 256, 260-61 (Del. 2002) ("To ensure certainty, [8 *Del. C.* §§ 151, 152, 153, 157, 161 and 166] contemplate board approval and a written instrument evidencing the relevant transactions affecting issuance of stock and the corporation's capital structure."). *See also* Robert S. Saunders et al., Folk on the Delaware Corporation Law § 166.01 (7th ed. 2021) (explaining that Section 166's requirement that "both a preincorporation and a postincorporation stock subscription agreement be reduced to writing and signed by the subscriber" is meant "to eliminate the uncertainty that attaches to an oral stock subscription agreement").

[60] JX 7.

[61] JX 8.

[62] JX 9.

accountant advised him otherwise—that "[t]here are no written agreements to show that you purchased the stock in question," "[t]he company set up a subscription receivable without your knowledge or consent," and "[t]he company cannot make up a false deduction for a so-called bad debt on the subscription receivable."[63] Osborn shared that advice with Academy *and the Company backed down.* Greenwood wrote privately to Mims and Graham that he was "sure that [he] explained the subscription receivable to [Osborn] . . . but unfortunately d[idn't] have documentation."[64] Mims spoke with Osborn who confirmed "he [wa]s going to sell the shares."[65]

The Company then "facilitated" Plaintiff's purchase of Shares from Osborn without ever mentioning a subscription receivable to Plaintiff.[66] Plaintiff wired payment for the Shares directly to Osborn, and Academy opted not to pursue repayment of the purported subscription receivable. The next month, in summarizing a discussion with the Company's consultant, Graham wrote that Academy "ha[d] a subscription receivable on the books that is technically from an employee no longer with the firm, unwilling to pay the receivable," and considered

---

[63] JX 25.

[64] JX 26.

[65] JX 27.

[66] PTO ¶¶ 11, 13. *See also, e.g.*, Graham Dep. at 34; JX 17; JX 18.

whether to "[w]rite off the receivable" altogether or to "[w]rite off the receivable from [Osborn]" and "add a new receivable from [Plaintiff], so the effect on [Academy's] books is neutral[.]"[67]

Again, in working through its accounting treatment, Academy never informed Plaintiff that it believed the Shares he purchased were subject to a subscription receivable. Nor did the stock certificate issued to Plaintiff indicate that the Shares were only partially paid.[68] If the Shares were ever subject to an enforceable subscription receivable, Plaintiff never assumed responsibility to pay it; he did not even know it existed.[69]

---

[67] JX 49.

[68] *See* 8 *Del. C.* § 156 ("Any corporation may issue the whole or any part of its shares as partly paid and subject to call for the remainder of the consideration to be paid therefor. *Upon the face or back of each stock certificate issued to represent any such partly paid shares*, or upon the books and records of the corporation in the case of uncertificated partly paid shares, *the total amount of the consideration to be paid therefor and the amount paid thereon shall be stated*.") (emphasis added).

[69] Academy asserts that "Plaintiff was aware or should have been aware of the Subscription Receivable in 2014" because "[a]pproximately two months before he entered the Sales Agreement with Mr. Osborn, Plaintiff received Academy's Private Placement Memorandum (PPM) Supplement," which stated that "'one employee contributed $37,533.58 in equity capital through the payment of a subscription receivable to the Company in conjunction with a 2012 grant of common shares.'" DOB at 16-17. But the PPM does not state that the Shares owned by Osborn were subject to a subscription receivable, and the Sale Agreement warranted that Osborn "[wa]s the sole owner of the shares and there are no liens or encumbrances thereon . . . ." JX 32.

Academy also points to an email in which Plaintiff refers to his purchase of Shares as a "subscription." *See* DOB at 16 (citing JX 130). *See also* Myers Dep. at 107 ("Q. Was it

23

Further, even if Plaintiff's shares were subject to a subscription receivable, the Company's purported cancellation of the Shares did not comply with Delaware law. Sections 163 and 164 of the DGCL govern the "assessment and collection of unpaid subscriptions for stock where the issuer remains solvent." Robert S. Saunders et al., Folk on the Delaware Corporation Law § 163.01 (7th ed. 2021) [hereinafter, "Folk"].[70] Section 163 provides that directors may "demand payment, in respect of each share of stock not fully paid," not to exceed the unpaid balance, and "shall give notice of the time and place of such payments" "at least 30 days before the time for such payment":

> The capital stock of a corporation shall be paid for in such amounts and at such times as the directors may require. *The directors may*, from time to time, *demand payment, in respect of each share of stock not fully paid*, of such sum of money as the necessities of the business may, in the judgment of the board of directors, require, *not exceeding in the whole the balance remaining unpaid on said stock*, and such sum so demanded shall be paid to the corporation at such times and by such installments as the directors shall direct. *The directors shall give notice of the time and place of such payments, which notice shall be given at least 30 days before the time for such payment*, to each holder of or subscriber for stock which is not fully paid at such holder's or subscriber's last known address.

---

your understanding that when you purchased your shares from [Osborn], it was an original subscription? . . . A. I guess in the initial purchase, yeah . . . . I'm not sure how to read the PPM completely, but it seems like that's the case."). Notwithstanding his use of the word "subscription," nothing in the record suggests that Plaintiff believed the Shares were subject to a "subscription receivable" as Academy has defined that term here.

[70] *See also Philips v. Slocomb*, 167 A. 698, 700 (Del. 1933) ("These two sections plainly indicate that their primary purpose is to provide for an operating company, a method of subscription to stock and the enforcement of such subscriptions.").

8 *Del. C.* § 163 (emphasis added). Section 164 then "prescrib[es] remedies for failure to pay any call made by the board pursuant to [S]ection 163." Folk § 164.01. Only after the board has made a call under Section 163, and "at the time when such payment is due, the directors may collect the amount" of the remaining balance through an action at law or by selling the delinquent shares at public sale:

> When any stockholder fails to pay any installment or call upon such stockholder's stock which may have been properly demanded by the directors, at the time when such payment is due, the directors may collect the amount of any such installment or call or any balance thereof remaining unpaid, from the said stockholder by an action at law, or they shall sell at public sale such part of the shares of such delinquent stockholder as will pay all demands then due from such stockholder with interest and all incidental expenses, and shall transfer the shares so sold to the purchaser, who shall be entitled to a certificate therefor.

> Notice of the time and place of such sale and of the sum due on each share shall be given by advertisement at least 1 week before the sale, in a newspaper of the county in this State where such corporation's registered office is located, and such notice shall be mailed by the corporation to such delinquent stockholder at such stockholder's last known post-office address, at least 20 days before such sale.

> If no bidder can be had to pay the amount due on the stock, and if the amount is not collected by an action at law, which may be brought within the county where the corporation has its registered office, within 1 year from the date of the bringing of such action at law, the said stock and the amount previously paid in by the delinquent stockholder on the stock shall be forfeited to the corporation.

8 *Del. C.* § 164.

Here, Academy did not inform Plaintiff of the subscription receivable, let alone demand that Plaintiff pay the unpaid balance, it did not provide 30 days' notice

25

of the time and place for such payment, and it did not bring an action at law or pursue a public sale of the Shares to recover the unpaid balance of the subscription receivable.[71]

Instead, Academy sought to justify its cancellation of the Shares as a *post hoc* litigation tactic. Notably, Academy first purported to cancel the Shares on March 30, 2022, in a letter claiming that Plaintiff had "breached: (i) his fiduciary duties that he owes to Academy as a shareholder in a closely held corporation; and (ii) the terms of his Separation Agreement . . . ."[72] That letter made no reference to a subscription receivable, and the "cancellation" was not recorded until October 17, 2022. Months later, in response to the Demand, Academy pivoted, asserting that the Separation Agreement had "released" the Shares and, alternatively, that the Shares had been canceled—but not due to a subscription receivable. Academy continued to argue that "Plaintiff released and relinquished all claims and rights he may have had against the Company pursuant to [the] Separation Agreement" in its Response to Plaintiff's Motion to Expedite, but then abandoned that defense.[73] It was not until

---

[71] PTO ¶ 34. *See also* Graham Dep. at 51 (testifying that Academy never asked Plaintiff to pay down a subscription receivable from 2016 through 2023); *id.* at 52 ("Q. Did you give any notice before this litigation began to Mr. Meyers that you were cancelling the alleged shares because a subscription receivable had not been paid off purportedly? A. No, we didn't.").

[72] JX 163, Ex. 2.

[73] Dkt. 8 ¶ 1.

Academy served written discovery responses in this litigation that the Company revealed its current position that the Shares had been canceled due to nonpayment of a subscription receivable.[74] Given its shifting strategies, the suggestion that Academy's "cancellation of the Alleged Shares was appropriate, fair and undertaken in good faith" raises eyebrows.[75]

For these reasons, I conclude that the Shares were not validly canceled and Plaintiff has met his burden to demonstrate by a preponderance of the evidence that he is an Academy stockholder with standing to demand books and records under Section 220.

### B. Plaintiff Has Demonstrated a Proper Purpose for Inspection.

"The paramount factor in determining whether a stockholder is entitled to inspection of corporate books and records is the propriety of the stockholder's purpose in seeking such inspection." *CM & M Gp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982). "In a section 220 action, a stockholder has the burden of proof to demonstrate a proper purpose by a preponderance of the evidence." *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 121 (Del. 2006).

---

[74] JX 180 at 11.

[75] Def. Academy Securities, Inc.'s Corrected Answering Pretrial Br. [hereinafter, "DAB"] at 10, Dkt. 71.

### 1. **Plaintiff Has Stated Proper Purposes.**

Plaintiff seeks books and records for two stated purposes: to ascertain the value of his shares, and to determine whether Academy has had meetings of stockholders for which Plaintiff was not provided notice. Academy contends that these purposes are "vague and conclusory" and therefore "insufficient to meet Plaintiff's burden to show that he is entitled to the relief sought" in the Demand.[76] I disagree.

First, under Delaware law, a stockholder's desire to value her interests in the company—particularly where the company is privately held—"has long been held as a proper purpose" to inspect books and records. *Woods Tr. of Avery L. Woods Tr. v. Sahara Enterprises, Inc.*, 238 A.3d 879, 890 (Del. Ch.), *judgment entered sub nom. In re Woods v. Sahara Enters., Inc.* (Del. Ch. 2020) (citing cases).

In response to Plaintiff's facially proper valuation purpose, Academy contends that Plaintiff has failed to establish "a particular need or reason for the valuation at the time of the demand."[77] Academy concedes that Plaintiff has "expressed interest in selling his Academy [S]hares" since 2020,[78] Academy has "no

---

[76] DOB at 18.

[77] *Id*. at 19 (citing *Mehta v. Kaazing Corp.*, 2017 WL 4334150, at *5 (Del. Ch. Sept. 29, 2017)).

[78] Graham Dep. at 82.

reason to doubt that [Plaintiff] was actually interested in selling his Academy [S]hares,"[79] and Plaintiff engaged with the Company and at least one other third party regarding a potential sale of the Shares in 2020 and 2021. Nevertheless, the Company asserts that "Plaintiff has offered no evidence that such efforts are ongoing" or "identified any other parties with whom he contemplated a sale of the . . . Shares."[80] Academy further suggests that "any purported need for present valuation is further undermined by the undisputable illiquidity of Academy's common stock as a closely-held company."[81] "In light of these issues," Academy claims "Plaintiff has failed to identify how he would use the valuation he claims to seek."[82]

"The Company's position is contrary to Delaware law." *Woods*, 238 A.3d at 891. "Delaware law does not require that a stockholder establish both a purpose for seeking an inspection and an end to which the fruits of the inspection will be put." *Id*. (citing *Lebanon Cty. Emps.' Ret. Fund v. AmerisourceBergen Corp*., 2020 WL 132752, at *11-14 (Del. Ch. Jan. 13, 2020), *aff'd*, 243 A.3d 417 (Del. 2020)). It is sufficient that stockholders state a proper purpose reasonably related to their interests as stockholders. Here, Plaintiff credibly testified that he is "seeking books

---

[79] *Id*.

[80] DOB at 20. Of course, it is unsurprising that Plaintiff paused efforts to sell his Shares once Academy claimed they had been canceled.

[81] *Id*. at 21.

[82] *Id*. at 22.

29

and records to establish a valuation for the equity that [he] own[s] in the company,"[83] and that, while he does not have an "immediate need to sell [his] Academy shares," "understanding the value of things that [he] own[s] is important to [him]."[84] This purpose "is clearly related to [Plaintiff's] interest as a stockholder of [the Company], and is therefore legally proper . . . ." *Macklowe v. Planet Hollywood, Inc.*, 1994 WL 560804, at *4 (Del. Ch. Sept. 29, 1994) (citing *CM & M Gp.*, 453 A.2d at 792-93; *Radwick Pty., Ltd. v. Med., Inc.*, 1984 WL 8264 (Del. Ch. Nov. 7, 1984)).

Second, Plaintiff requests books and records in order to determine whether Academy has conducted stockholder meetings for which Plaintiff was not provided notice. In support of that purpose, Plaintiff identifies two requests for stockholder action—namely, redemption offers sent to stockholders on December 1, 2021 and November 15, 2022—for which Plaintiff did not receive notice.

This Court has found a proper purpose where a stockholder sought information "to inform itself of those corporate transactions of which it was entitled to notice and an opportunity to vote . . . ." *Helmsman Mgmt. Servs., Inc. v. A & S Consultants, Inc.*, 525 A.2d 160, 166 (Del. Ch. 1987). As Vice Chancellor Jacobs explained in *Helmsman*:

---

[83] Myers Dep. at 100.

[84] *Id*. at 75.

> That a shareholder is entitled to notice of the date, time, and place of an annual shareholder's meeting is a proposition so fundamental as to require no citation of authority. It would follow that a shareholder who is not furnished with such notice should be permitted to inform himself of those corporate transactions about which he could have otherwise learned and voted upon. For that purpose, the stockholder should be entitled to inspect the appropriate books and records of the corporation.

*Id.* Plaintiff has, therefore, stated a proper purpose to investigate whether he has received proper notice of all stockholder meetings.

### 2. Plaintiff's Stated Purposes Are His Actual, Primary Purposes.

Academy next argues that even if Plaintiff's stated purposes are facially proper, they are "pretextual and not his actual purpose" for seeking books and records.[85]

"[O]nce a stockholder has identified a proper purpose . . . the burden shifts to the corporation to prove that the stockholder's avowed purpose is not her actual purpose and that her actual purpose for conducting the inspection is improper." *Woods*, 238 A.3d at 891. "[O]ur courts have given credence to such defenses only where it is evident from the facts on the record that the plaintiff's actual, predominating, purpose is something unrelated to the plaintiff's purpose as a stockholder." *Sutherland v. Dardanelle Timber Co.*, 2006 WL 1451531, at *9 (Del. Ch. May 16, 2006). "'Such a showing is fact intensive and difficult to establish.'"

---

[85] DOB at 23.

*Inter-Loc. Pension Fund GCC/IBT v. Calgon Carbon Corp.*, 2019 WL 479082, at *9 (Del. Ch. Jan. 25, 2019) (quoting *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 817 (Del. Ch. 2007)), *aff'd*, 237 A.3d 818 (Del. 2020).

Academy asserts that Plaintiff's stated purposes are "pretexts meant to obscure Plaintiff's actual purpose, which Academy believes is to cause financial, competitive, and/or reputational harm to Academy."[86] Academy argues that (1) "at the time he served the Demand, Plaintiff was, according to FINRA, employed by and registered with [Blue Ocean,] a competing broker-dealer"; and (2) Plaintiff's true purpose is to harm the Company for reasons of personal animus, evidenced by "a series of highly offensive and defamatory email attacks sent from anonymous accounts, the timing and circumstances of which suggest Plaintiff's involvement."[87] In my view, Academy has not met its burden to prove that Plaintiff's purpose is to gain a competitive advantage or cause reputational harm, rather than value his Shares.

First, to the extent Academy claims Plaintiff seeks to gain a competitive advantage, the premise of that argument is suspect. The parties agree that Plaintiff's current employer, Palantir, is not a competitor of the Company, and Plaintiff denies

---

[86] DOB at 24.

[87] *Id*. at 24-25.

that he is employed by, or has ever received compensation from, Blue Ocean.[88]  But even if Plaintiff has worked in some capacity for a competitor of Academy, that fact "does not result in a forfeiture of [his] statutory rights under § 220." *Safecard Servs., Inc v. Credit Card Serv. Corp.*, 1984 WL 8265, at *3 (Del. Ch. Sept. 5, 1984).  As this Court has explained, "[t]he mere fact that a shareholder is a competitor cannot preclude a right to inspect corporate records." *Id.*

Second, the record does not support Academy's position that Plaintiff sent the Demand for reasons of personal animus.  Academy did not prove that Plaintiff sent the Proton emails,[89] and the other "evidence" on which Academy relies—notes from

---

[88] Myers Dep. at 20-22.  Academy accuses Plaintiff of violating FINRA Rules by registering with Blue Ocean when he was not employed there.  DOB at 26-27.  That argument does not call into question Plaintiff's purposes in making the Demand.  Academy also contends that Plaintiff "refus[ed] to return a laptop provided by Academy which contains commercially-sensitive information," DOB at 25, but that assertion is not supported by the record.  *See* Myers Dep. at 111-12 ("[W]hen I departed, it was under discussion that I was going to continue to bolster and support the brand and so in March my laptop was never asked for and I continued to help the company for months going forward using that."); JX 73 (internal Academy email noting in April 2020 that the laptop would be "staying in [Plaintiff's] possession").

[89] Plaintiff testified under oath that he did not send the Proton emails, and Academy acknowledges "that the evidence to date of Plaintiff's role in these email attacks is largely circumstantial."  Meyers Dep. at 84-86; DOB at 28.  Nevertheless, Academy asserts that there are "several signs which point to Plaintiff's involvement," including that "the timing of the Proton Emails closely corresponds with a period of disagreement and tension" between the parties; Plaintiff has used a Proton Mail account that, like the senders of the emails in question, contains a military reference; the emails were sent to Academy's clients, suggesting the sender had "firsthand knowledge of Academy's business and clients"; Plaintiff and the sender of the Proton emails both "use[] all lower-case when referring to

33

Plaintiff that he does not "trust these guys"[90] and is "not on good terms" with Academy,[91] and a social media comment supporting another veteran-owned broker-dealer[92]—does not suggest that Plaintiff sent the Demand to harass the Company. To the extent there is hostility between the parties now, it appears to have been caused by Academy's refusal to provide Plaintiff with financial information to value his Shares, and its retaliatory cancellation of his Shares.[93]

Academy or Mr. Mims"; Plaintiff's other communications have "indicate[d] dissatisfaction with and hostility toward Academy and its officers"; and Plaintiff did not search his Proton Mail account. DOB at 30-34. Weighing the evidence, I do not believe Academy has met its burden to prove by a preponderance of the evidence that Plaintiff authored the Proton emails.

[90] JX 125.

[91] JX 149.

[92] JX 186.

[93] Academy also claims that "it is Plaintiff's father—not Plaintiff—who is behind Plaintiff's Demand," pointing to an email from December 2021 in which Plaintiff's father suggested that Plaintiff "request[] some Company financials from them as to how they are valuing the Company." DAB at 13 (citing JX 152); *see also id.* at 15 (citing *Wilkinson v. A. Schulman, Inc.*, 2017 WL 5289553, at *2 (Del. Ch. Nov. 13, 2017), for the proposition that "purposes for inspection must be the stockholder's own 'actual purposes' and not another party's"). This case bears no resemblance to *Wilkinson*, in which "the trial record established that the purposes for the inspection belonged to" counsel and not the plaintiff himself, and that the plaintiff "simply lent his name to a lawyer-driven effort by entrepreneurial plaintiffs' counsel." *Wilkinson*, 2017 WL 5289553, at *2. If anything, the correspondence between Plaintiff and his father further supports the sincerity of Plaintiff's valuation purpose.

Third, even if Plaintiff has "secondary motivations for seeking inspection,"[94] I remain convinced that Plaintiff's actual, primary purposes are those stated in his Demand. Plaintiff testified, credibly, that he wants to "understand[] the value" of his Shares and determine "if Academy had shareholder meetings . . . without notice," which makes sense given Plaintiff's years-long efforts to sell his Shares, and the Company's failure to provide him with notice of at least two redemption offers.[95]

In short, Academy has not met its burden to prove by a preponderance of the evidence that Plaintiff's actual, primary purposes for seeking books and records are other than those stated in the Demand.

## C. Scope of Production

Because Plaintiff has established a right to inspection, I turn to the scope of the Demand.

"The scope of inspection is a fact-specific inquiry, and the court has broad discretion when conducting it." *Hightower v. SharpSpring, Inc.*, 2022 WL 3970155, at *8 (Del. Ch. Aug. 31, 2022). The stockholder plaintiff "bears the burden of proving that each category of books and records is essential to accomplishment of

---

[94] *Sutherland*, 2006 WL 1451531, at *8 (explaining that defenses like the ones asserted by Academy "must first overcome the extensive decisional law to the effect that secondary motivations for seeking inspection, even if improper, will not be examined by the court once a proper purpose has been established").

[95] Myers Dep. at 75, 101.

the stockholder's articulated purpose for the inspection." *KT4 Partners LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 751 (Del. 2019).

To determine which documents are necessary and essential to accomplish a proper purpose, recent decisions have grouped requests for books and records into three categories:

- "Formal Board Materials," or "board-level documents that formally evidence the directors' deliberations and decisions and comprise the materials that the directors formally received and considered";

- "Informal Board Materials," which "generally will include communications between directors and the corporation's officers and senior employees, such as information distributed to the directors outside of formal channels, in between formal meetings, or in connection with other types of board gatherings"; and

- "Officer-Level Materials," which are "communications and materials that were only shared among or reviewed by officers and employees."

*Hightower*, 2022 WL 3970155, at *9 (quoting *Lebanon Cnty. Emps.' Ret. Fund v. Amerisourcebergen Corp.*, 2020 WL 132752, at *25 (Del. Ch. Jan. 13, 2020), *aff'd*, 243 A.3d 417 (Del. 2020)). "The starting point (and often the ending point) for an adequate inspection will be" Formal Board Materials. *Woods*, 2020 WL 4200131, at *11. With the proper showing, an inspection may extend to Informal Board Materials and/or Officer-Level Materials as well. *Id.*

36

The Demand seeks eleven categories of books and records from the Company. Academy contends that the Demand is overbroad to the extent that it seeks: (1) information regarding capital distributions, dividends, and similar payments; (2) information concerning interested-party transactions and the compensation of directors, officers and managers; (3) Academy's stock list and stock ledgers; and (4) information over a five-year time period.[96]

### 1. Financial Documents

Academy does not contest that Plaintiff's requests for "financial statements . . . presented to or approved by Academy's Board . . . or any committee thereof, including any income statement and any balance sheet for Academy Securities"; "financial reports or summaries of Academy that were provided to Academy's Board or any committee thereof"; and "Academy's capitalization table" are necessary and essential to Plaintiff's valuation purpose. Similarly, Academy does not contest that "[t]he results of Academy's 'Redemption Offer' dated December 1, 2021"; "[c]opies of any rules or regulations adopted by Academy's Board of Directors for the conduct of shareholder meetings"; and "[t]he current bylaws of Academy" are necessary and essential for Plaintiff's purpose of determining whether Academy has provided

---

[96] *See* DOB at 36.

Plaintiff with proper notice of all stockholder meetings.[97]  Documents responsive to these requests should be produced.

### 2. Capital Distributions, Dividends, And Other Payments

The Demand requests "[a] listing of all capital distributions, dividends, or similar payments to stockholders, lenders, or other investors between January 31, 2018 and the present, along with any board resolutions related to those transactions."[98]  Plaintiff states that this information is "plainly within the types of information that companies are obligated to provide to shareholders"[99] and "clearly relevant to plaintiff's valuation purpose,"[100] but offers no other argument or authority in support of those assertions.  Plaintiff has not met his burden to demonstrate that this information is necessary and essential to his purposes, to the extent it is not otherwise reflected in the documents referenced above.

### 3. Information Regarding Interested-Party Transactions And Director And Officer Compensation

The Demand seeks "[d]ocuments, correspondence, and reports concerning any interested-party transactions" and "[a]ll materials created for or provided to the Board or any committee thereof from January 31, 2018 to the present concerning

---

[97] JX 162, Demand at 2-3.

[98] *Id*. at 2.

[99] Pl.'s Pre-Trial Opening Br. [hereinafter, "POB"] at 51, Dkt. 56.

[100] Pl.'s Pre-Trial Answering Br. [hereinafter, "PAB"] at 26-27, Dkt. 62.

compensation or remuneration for directors, officers or managers of the company

. . . ."[101]  Plaintiff is entitled to Formal Board Materials responsive to these requests, which are necessary and essential to his valuation purposes.  *See Woods*, 238 A.3d at 900 (explaining that "[a] valuation professional can use this information to make normalizing adjustments to the extent necessary when valuing the firm"); *see also id*. ("More fundamentally, how directors and senior officers are compensated and whether they are the beneficiaries of any related-party transactions are basic facts that stockholders are entitled to know.").  After reviewing the Formal Board Materials, it may be appropriate for Plaintiff to renew his request for Informal Board Materials and/or Officer-Level Materials.

### 4.  List Of Stockholders And Stock Ledgers

The Demand also requests "[a] list of Academy stockholders and Academy's stock ledgers as of January 1, 2022; June 1, 2022; and January 1, 2023."[102]  This request is not necessary and essential to either of Plaintiffs' stated purposes, which are to value the Shares and to determine whether Academy has had meetings of stockholders for which Plaintiff was not provided notice.  While one can easily conceive of a proper purpose for accessing the Company's stock list and ledger under

---

[101] JX 162, Demand at 3.

[102] JX 162, Demand at 3.

the present circumstances,[103] no such purpose is articulated in the Demand.  To be clear, I do not view this report as precluding Plaintiff from seeking the stock list through a new demand asserting a proper purpose therefor.

### 5.  The Covered Period

Most of the requests in the Demand seek documents from January 31, 2018 through the present.  "Valuations are often based on historical trends, and a five-year period is common."  *Woods*, 238 A.3d at 902 (citing *Dobler v. Montgomery Cellular Hldg. Co.*, 2001 WL 1334182, at *5-6 (Del. Ch. Oct. 19, 2001); *Carroll v. CM & M Gp., Inc.*, 1981 WL 7626, at *5 (Del. Ch. Sept. 24, 1981), *aff'd*, 453 A.2d 788 (Del. 1982)).  That time period is reasonable and should apply to all of Plaintiff's requests, including those without a specified time period.

### D.    Confidentiality

Academy requests that any "production be subject to a confidentiality order, including a designation for 'attorneys' and accountants' eyes only' documents which Academy reasonably believes in good faith to contain particularly sensitive

---

[103] *See, e.g.*, *Macklowe*, 1994 WL 560804, at *7 (finding stockholder was entitled to the corporation's stock list or ledger for the proper purpose of "possibly soliciting buyers of [the plaintiff's] shares," since "[i]t [wa]s reasonable to conclude that existing . . . stockholders would be logical prospects as purchasers of shares that [plaintiff] may decide to sell," "given the normally limited market for shares in a closely held corporation whose stock is not publicly traded").

40

information."[104]   At trial, Plaintiff's counsel represented that Plaintiff would be amenable to a standard confidentiality agreement.  The parties should meet and confer regarding an appropriate confidentiality order within five days of this final report becoming an order of the Court.

### E.    Fee-Shifting

Finally, Plaintiff seeks an award of costs and attorneys' fees, and requests the opportunity to further address fee-shifting following trial.[105]

"While the so-called American Rule dictates that each party is responsible for its own legal fees, this Court retains discretion to shift fees for bad faith conduct 'to deter abusive litigation and protect the integrity of the judicial process.'"  *Bruckel v. TAUC Holdings, LLC*, 2023 WL 116483, at *5 (Del. Ch. Jan. 6, 2023).  In *Pettry v. Gilead Sciences, Inc*., the Chancellor permitted plaintiffs to move for fees where the corporate defendant "exemplified the trend of overly aggressive litigation strategies" by, among other things, "taking positions for no apparent purpose other than obstructing the exercise of Plaintiff's statutory rights" to books and records.  2020 WL 6870461, at *30.  Plaintiff seeks fees under a similar theory, arguing that Academy "has taken shifting, mutually inconsistent positions as to when it

---

[104] DOB at 37.

[105] POB at 52-54; PAB at 27-28.

41

purportedly canceled Plaintiff's shares and engaged in misrepresentations in its books and records to paper a purported cancellation of Plaintiff's shares."[106]

For reasons discussed above, fee shifting may be appropriate here.[107] Plaintiff should be permitted to move for costs and attorneys' fees within 30 days of this final report becoming an order of the Court.

## III. CONCLUSION

I recommend that judgment be entered for Plaintiff as set forth above. The parties should meet and confer regarding a form of order memorializing the scope of the required production within five days of this final report becoming an order of the Court.

This is a final report and exceptions may be taken pursuant to Court of Chancery Rule 144(d)(2). The stay of exceptions entered under the Chancellor's May 9, 2023 letter is hereby lifted.

---

[106] POB at 53. Plaintiff also argues that Academy has "refused to provide the basis for its 'Proton Mail' allegations," "failed to provide any meaningful analysis of whether and how Blue Ocean was a 'competitor' of Academy's," and improperly claimed that certain discovery requests were "duplicative." *Id*. at 53-54; PAB at 27-28.

[107] *See* pp. 19-27, *supra*.