# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MICHAEL STOCK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-0109-LM |
| | ) | |
| SUSTAINABLE ENERGY | ) | |
| TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## FINAL POST-TRIAL REPORT

Final Report: October 30, 2023
Date Submitted: July 28, 2023

Thomas E. Hanson Jr. & William J. Burton, BARNES & THORNBURG LLP, Wilmington, Delaware; *Attorneys for Plaintiff Michael Stock.*

Tyler J. Leavengood, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; *Attorney for Defendant Sustainable Energy Technologies, Inc*.

**Mitchell, L.**

Defendant Sustainable Energy Technologies, Inc. is a national supplier of energy storage devices or *Power Packs* that replace lead acid and lithium-ion batteries in various markets. The plaintiff, Michael Stock, owns 2.1 million shares of stock in the defendant company. Plaintiff alleges that since his initial investment in the company, it has paid its officers excessive compensation while failing to make significant progress in bringing their alternative battery technology to market. He blames the excessive compensation arrangement for why the company generated little to no revenue in 2022—in stark contrast to its projected 2022 revenue of $27.8 million.

To uncover how the company used his investment, investigate further claims of mismanagement of funds, and value his shares, the Plaintiff sought to inspect Sustainable Energy Technologies, Inc.'s books and records pursuant to Section 220 of the Delaware General Corporation Law. The company initially offered the Plaintiff some of the requested records but conditioned the offer on the execution of a mutually agreeable confidentiality agreement. The Plaintiff failed to execute the agreement and in turn, the company refused to release the information.

Following the initial demand, the Plaintiff was voted off the company's board of directors. He then sought to formalize and legitimize an alleged handshake deal he had with the defendant company through his own private company for exclusive distribution rights. The defendant company rejected ever having an agreement.

2

Having never received any of the earlier requested documents, the Plaintiff renewed his demand submitting another request. Defendant company never responded to the second request. On January 30, 2023, Plaintiff filed this complaint.

Following a one-day trial held on July 7, 2023, in New Castle County, Delaware, the parties submitted post-trial briefing. After reviewing the parties' post-trial submissions, trial evidence, pre-trial briefing and supportive memoranda, I find that Plaintiff has both, stated a proper purpose for inspection under Section 220 and has met his minimal burden of establishing a credible basis for suspected wrongdoing under Section 220. However, I do not agree that all the documents Plaintiff seeks are necessary and essential for Plaintiff's stated purposes. To that end, I recommend Plaintiff's demand be granted with respect to those documents which are necessary and essential and deny the demand with respect to all others.

This is my final report.

## I.    BACKGROUND[1]

Sustainable Energy Technologies, Inc. ("SETI" or the "Company"), is a Delaware corporation headquartered in Elkhart, Indiana and offers its patented

---

[1] All facts cited herein are taken from the trial transcript, cited as "Tr. __"; the parties jointly submitted exhibits list, cited as "JX __"; the parties opening briefs respectively as "DOB" and "POB"; the Joint Pre-Trial Stipulation and Order, cited as "PTO and filed on the Docket as ("Docket Item") D.I. 68; and the parties post-trial briefs respectively as "PPB" and "DPB"."

Hybrid Graphene Super Capacitor Power PackTM ("Power Pack") – a substitute for lead-acid, nickel-cadmium and lithium-ion batteries.[2] According to the executive summary in its business plan, "SETI [] is a national supplier of energy storage devices or Power Packs that replace lead acid and lithium-ion batteries in various markets."[3]

SETI is managed by a board of directors not to exceed seven members.[4] Pursuant to SETI's bylaws, the Company "may establish a reasonable compensation of all directors for services to the corporation … or may delegate such authority to an appropriate committee."[5] Chris Sanders ("Sanders") is SETI's CEO.[6] Fred Solomon ("Solomon") is a former chairman of the board of directors.[7] Sanders and Solomon are related.[8] Additionally, Sanders is married to SETI's chief administrative officer, Tara Brown ("Brown").[9]

---

[2] PTO at 8; JX 1; JX 50 at 3.

[3] JX 50 at 3.

[4] JX 1 at 13.

[5] JX 1 at 14-15.

[6] PTO at 8.

[7] Tr. 13:2-5.

[8] Solomon is Sander's stepfather. PTO at 8.

[9] PTO at 9.

Michael Stock ("Plaintiff" or "Stock") was the founding investor and a former member of the board of directors of SETI.[10] Prior to his involvement with SETI, Plaintiff worked in the RV industry in Elkhart, Indiana, where he grew up.[11] Eventually, Plaintiff formed a sales and marketing company, MITO[12], primarily serving RV manufacturers in the Elkhart, Indiana market.[13] Based on his familiarity with the area, Plaintiff was uniquely situated in understanding the "beachhead" markets in Indiana.[14]

## A.    SETI's Business

Plaintiff's knowledge about "all of the problems about energy storage in the RV industry" drew him to SETI and he was eventually put into contact with Sanders.[15] The same day they connected on the phone, Sanders drove from Fort Myers, Florida to meet with Plaintiff at his home in Naples, Florida.[16] Sanders was trailering a golf cart equipped with a Power Pack battery.[17]

---

[10] Tr. 102:9-14.

[11] Tr. 102:5-14.

[12] MITO stands for "Mike and Tom." Tom Fuller is Stock's business partner. Tr.102:11-14.

[13] JX 50 at 26.

[14] Beachhead markets are those most "fruitful" to SETI's business, which included golf carts, RVs and the marine industries. Tr. 44:14-15; JX 208.

[15] Tr. 104:2-18.

[16] Tr. 100:19; 104:16-24.

[17] Tr. 104:22-24.

After meeting with Brian Nangle ("Nangle"), SETI's president, Plaintiff was convinced that "[Power Packs] [are] a product that could be very useful in the marketplace."[18]

Plaintiff made his initial investment in SETI in December 2019, purchasing 1,000,000 shares for $500,00.00 – fifty cents per share.[19] Plaintiff purchased an additional 1,000,000 shares the following month, in January of 2020.[20] From the time of his first purchase in December 2020 until September 2022, Plaintiff was a member of the Company's board of directors.[21]

Plaintiff maintains that as part of his joining SETI, MITO was to receive an exclusive distribution agreement to service the "beachhead" market in Elkhart, Indiana.[22] Plaintiff alleges that before his initial investment, Sanders made representations to him that SETI was "looking for an investor to secure the exclusive license for the United States" from Dongguan City Gonghe Electronics Co. LTD ("Gonghe").[23] Stock testified that he agreed, but only for "something in return."[24]

---

[18] Tr. 106:23-24.

[19] JX 3 at 2.

[20] JX 15. Plaintiff subsequently made another 100,000-share purchase from Sanders, bringing his total to 2,100,000 shares of SETI. PTO at 9; Tr. 114:1-6.

[21] PTO at 28.

[22] Tr. 157-158.

[23] Tr. 108:12-20.

[24] *Id.*

Following his investment, Stock said that he and Sanders "shook" on a deal giving Stock "the Northern Indiana distributorship for the RV, marine, and the markets [he] work[ed] in.[25]

**B.    SETI's Agreement with Gonghe Electronics**

During Plaintiff's tenure on the board, SETI entered into an Exclusive Distribution and Business Collaboration Agreement with Gonghe on June 15, 2021 (the "Gonghe Agreement").[26]  In the Gonghe Agreement, Gonghe appointed SETI as its exclusive distributor for its Graphene Supercapacitor Battery Cells and Packs with integrated Capacitor Management Systems.[27]  SETI represented its relationship with Gonghe in its business plan ("Business Plan").[28]  The business plan also references MITO, indicating that they are a "sales partner" and that they are "responsible for SETI's marketing, sales, warehousing, and inventory management."[29]  There is no indication that MITO has an exclusive sales distribution agreement with SETI in the Business Plan.

---

[25] Tr. 109:18-24.

[26] JX 6.

[27] JX 6.

[28] JX 50 at 3 ("SETI's founders and executive team [] secured an Exclusive Sales, Distribution and Business Collaboration Agreement for the Hybrid Super Capacitor Power Packs with GongHe Electronics Limited for the US markets.").

[29] JX 50 at 4.

### C.     SETI's Private Placement Memorandum

SETI also implemented a Private Placement Memorandum ("PPM") geared at enticing investors to put money into SETI's business.[30]  Stock alleges the PPM was misleading in its representations about MITO.[31]  The PPM stated that SETI had "partnered with MITO" and that negotiations had begun between SETI and MITO "to enter into a contract for leasing, inventory management, marketing, and sales and distribution services."[32]  The next paragraph in the PPM reveals that "the Company has entered into an Exclusive Distribution Agreement with Gonghe Electronics."[33]  Plaintiff, when pressed, conceded that like the Business Plan, the PPM did not identify an exclusive distribution agreement between SETI and MITO.[34]

### D.     Management Compensation

On January 25, 2022, William Harrington, another SETI board member, circulated an email to the SETI board attaching recommendations for compensation to be considered at a board meeting the following day.[35]  The compensation

---

[30] JX 51.

[31] Tr. 144:5-14.

[32] JX 51 at 20; *see also* JX 51 at 12 ("The Company has *partnered* with MITO… which supports the Company with offices, warehousing facilities, inventory management, research, marketing, and sales and distribution.") (Emphasis added).

[33] *Id.*

[34] Tr. 160-161.

[35] JX 69.

committee recommended Sanders and Chief Technology Officer David Strumpf ("Strumpf") be "granted significantly and timely salary increases", with Sander's salary rising to $500,000 from $360,000.[36] Amid obvious concerns about the increases and SETI's burn rate, the board, temporarily deferred consideration of compensation.[37]

In response to the apparent concerns over compensation, Nangle offered to "reduce by 70%" his compensation following the January 26 board meeting "until such time as the planned further raise of [$5,000,000 additional funding was] complete."[38] Wen Wu, another member of the SETI board and an important liaison with Chinese based Gonghe for linguistic reasons, resigned from the board following the compensation talks.[39] According to Lyons, Wu "was frustrated that there was what he believed [was] excessive compensation."[40]

The board readdressed compensation at the April 7, 2022 meeting.[41] The compensation being paid to Sanders, Solomon, and Brown worried Plaintiff and

---

[36] *Id.* at 3.

[37] JX 75 at 1.

[38] JX 75 at 1.

[39] Tr. 20:1-15.

[40] Tr. 20:9-10.

[41] JX 110; Tr. 57:24-58:1.

other board members.[42] Craig Lyons ("Lyons"), owner of Lyon Legacy Trust and a member of the SETI board, expressed his concerns regarding compensation at trial.[43] Lyons voted against the compensation committee's recommendation.[44] Nangle and Strumpf, along with Plaintiff, also abstained from the vote.[45] Sanders, Solomon, and Harrington voted in favor of the compensation committee's recommendation.[46] Thus, on April 7, 2022, the board approved the compensation amounts by a vote of three to one, with three abstentions.[47]

## E.    Plaintiff's Demands

Plaintiff served his initial demand for books and records on SETI September 2, 2022 ("First Demand").[48] In response, Sanders scheduled a board meeting on

---

[42] Tr. 58:23-24.

[43] Tr. 54:6-16 ("My concern was…pay ourselves, paying the team, too much. … I was frustrated that the first thing we did [after raising capital] is go and try and pay people more.").

[44] Tr. 57:15-16.

[45] Tr. 57:21-22.

[46] JX 110; Tr. 57:22-24.

[47] JX 110; Tr. 57:24-58:1; Tr. 177:9-12. Sanders ultimately stayed at his previous salary of $360,000 and Plaintiff conceded at trial that he did not vote against the proposed compensation for Sanders, Solomon, or Brown when their salaries were originally set. *See* Tr. 177-181; *but see* Tr. 181:21-22 ("I always thought the salaries were way too high. Always."). Rather, Plaintiff abstained from the vote on Sander's compensation. JX 110 at 3.

[48] JX 171.

September 6, 2022, which Plaintiff attended.[49] Sanders initiated the board meeting "to discuss the [First Demand]."[50]

The First Demand sought:

(a) Any and all records pertaining to [Plaintiff's] investment in SETI including but not limited to: i. Shareholder agreements; ii. Marketing materials; iii. All emails pertaining to [Plaintiff's] investment; iv. Bank records; v. Correspondence of any kind and in any form; vi. Any written agreement related to or pertaining to the investment of [Plaintiff] in SETI.

(b) Any and all records pertaining to SETI's Investment in MTPV, including but not limited to: i. Shareholder agreements; ii. Marketing materials; iii. All emails pertaining to [Plaintiff's] investment; iv. Bank records; v. Correspondence of any kind and in any form; vi. Any written agreement related to or pertaining to the investment of [Plaintiff] in SETI.

(c) Excerpts from minutes of any meeting of the Board of Directors, records of any action of a committee of the Board of Directors while acting in the place of the Board of Directors on behalf of the corporation, minutes of any meeting of the shareholders, and records of action taken by the shareholder or Board of Directors without a meeting from January 2020 through July 2022.

(d) Accounting records of the corporation covering the period of January 2020 through July 2022;

(e) The records of shareholders;

(f) Any other books and records;

(g) The Corporation's Articles or restated Articles of Incorporation and all amendments to them currently in effect;

(h) The Corporation's Bylaws or restated Bylaws and all amendments to them currently in effect;

(i) Resolutions adopted by the Corporation's Board of Directors in January 2020 through July 2022 creating one or more classes or series of shares and fixing the relative rights, preferences, and

---

[49] JX 172 at 2; JX 173.

[50] *Id.*

11

limitations, if shares issued pursuant to those resolutions are outstanding;

(j) The minutes of all shareholders meetings and records of all actions taken by shareholders without a meeting in January 2020 through July 2022;

(k) All written communications to all shareholders generally or all shareholders of a class or series in January 2020 through July 2022, including financial statements furnished under Delaware Statutes;

(l) A list of the names and business street address of the Corporation's current Directors and Officers;

(m) The Corporation's most recent annual report delivered to the Department of State under Delaware law; and

(n) All records of the Corporation, including all records reflecting all activity in January 2020 through July 2022."[51]

According to the First Demand, Plaintiff's purpose for requesting the documents was "for [Plaintiff] to determine the financial status of [SETI] as well as the activity of the Corporation from January 2020 through July 2022."[52]

In response to the First Demand, SETI confirmed its willingness to turn over certain documents.[53] Namely, SETI would turn over (1) any restatements or amendments to SETI's incorporating documents or bylaws, (2) employment agreements, (3) 2021 and 2022 financial statements, (4) any promissory notes for which there is an amount due, (5) a stockholder list, and (6) the final versions of all written consents and minutes of any meetings of stockholders or directors.[54]

_____

[51] JX 171 at 4.

[52] JX 171 at 5.

[53] JX 204.

[54] JX 204 at 1-2.

12

SETI also proposed a confidentiality agreement to Plaintiff. Stock did not execute the confidentiality agreement and seemed at trial to be unsure of why it was never done.[55] Nevertheless, Plaintiff did not receive any documents from SETI in response to his First Demand.

Following Plaintiff's First Demand, the board voted to remove Plaintiff as a board member. He was officially removed from the board on September 16, 2022.[56] The same day, Plaintiff's counsel forwarded SETI's counsel a letter formally demanding that SETI and MITO formalize their distribution agreement.[57] SETI's counsel responded stating that "SETI not only refuses to provide a draft of such a document, but it vehemently denies that any such distribution rights were offered to MITO or [Plaintiff]."[58]

Plaintiff made another demand for books and records on January 9, 2023 (the "Demand").[59] Plaintiff's Demand requested different documents, seeking:

1. All notices, minutes, consents and resolutions of the Board, and any Board committees, related to the Company's distributorship relationships, investor solicitations, Mr. Stock's termination and/or the use of investor funds from January 1, 2020, to the present;

---

[55] *See* Tr. 238-240; Tr. 240:14-15 (Stock testified that he "had no problem [signing] a confidentiality agreement.").

[56] Tr. 226:22-227:4.

[57] JX 183.

[58] JX 185.

[59] JX 208.

13

2. The Company's articles of incorporation and bylaws, including any amendments thereto;

3. All employment agreements between the Company and any officers or other employees of the Company from January 1, 2020, to the present;

4. All documents and communications related to any bonus or other compensation received by any officers or other employees, or third parties (including Company counsel, Don Weinbren) of the Company from January 1, 2020 to the present;

5. All documents and communications related to Mr. Stock's investment in the Company, including any shareholder or other agreements, marketing materials and/or bank records;

6. All documents and communications related to MITO serving as a distributor for the Company or any offer for MITO to so serve;

7. All documents and communications related to Mr. Stock's service on the Company's Board;

8. All documents and communications related to the PPM and Business Plan, including any divergence from the plans stated therein;

9. All documents and communications related to the Company's agreement with Gonghe Electronics, including any defaults thereunder.

10. All communications and agreements with existing or potential investors in the Company;

11. True and full information regarding the status of the business and financial condition of the Company, including the development of its Power Packs and other key products;

12. Full and proper ledgers, other books of account, and records of all receipts and disbursements, other financial activities, and the internal affairs of the Company for 2020, 2021 and 2022 YTD;

13. Audited and/or unaudited financial statements, including a balance sheet, a statement of income and loss, a statement of cash flow, along with accompanying footnotes, and any semi-annual reports, for the Company for 2020, 2021 and 2022 YTD;

14. Copies of the Company's federal, state and local income tax returns for the years 2020 and 2021;

15. A current list of the name and last known business, residence and/or mailing address of each stockholder of the Company; and

16. The names and contact information for each officer and director of the Company, including his or her date of appointment or election."[60]

## II.    PROCEDURAL POSTURE

Plaintiff filed this action pursuant to 8 *Del. C.* § 220 on January 30, 2023, seeking to inspect SETI's books and records.[61]  SETI answered the complaint on February 22, 2023.[62]  Following SETI's answer, both parties moved to compel discovery from each other.[63] Prior to hearing arguments on the motions, this case was reassigned to me by the Chancellor.[64]  On May 23, 2023, I heard oral arguments on the motions to compel, denying Plaintiff's motion and granting in part the Company's.[65] Following a one day trial in Wilmington, Delaware on July 7, 2023,[66] the parties submitted post-trial briefing.[67]

---

[60] JX 208.

[61] D.I. 1.

[62] D.I. 10.

[63] D.I. 20, 22.

[64] D.I. 42.

[65] D.I. 50-51.

[66] D.I. 71.

[67] D.I. 74, 75.

## III.  LEGAL STANDARD

Section 220 "provides stockholders with a qualified right to inspect corporate books and records."[68]  To obtain books and records, "a stockholder must satisfy the statute's form and manner requirements."[69]  Plaintiff must demonstrate by "a preponderance of the evidence, a proper purpose entitling [him] to inspection of every item sought."[70]  He must also prove by a preponderance of the evidence that "each category of books and records is essential to accomplishment of the [Plaintiff]'s articulate purpose for inspection."[71]  Lastly, "a plaintiff who proves all of these may be limited in its use of any information where the information is confidential and release would harm the company."[72]

### A.  Plaintiff's Purposes

A stockholder's proper purpose is the supreme factor in determining whether they are entitled to inspection of the corporation's book and records.[73]  Section 220

---

[68] *Simeon v. Walt Disney Co.*, 2023 WL 4208481, at *18 (Del. Ch. June 27, 2023); 8 *Del. C.* § 220.

[69] *Disney*, 2023 WL 4208481 at *18; 8 *Del C.* § 220(b).

[70] *Thomas & Betts Corp. v. Leviton Mfg. Co., Inc.*, 681 A.2d 1026, 1028 (Del. 1996).

[71] *Disney* at *18; Lebanon Cnty. Emps.' Ret. Fund v. AmerisourceBergen Corp.,* 2020 WL 132752, at *6 (Del. Ch. Jan. 13, 2020), *aff'd,* 243 A.3d 417 (Del. 2020); *Thomas & Betts,* 681 A.2d at 1035.

[72] *Pershing Square, L.P. v. Ceridian Corp.*, 923 A.2d 810, 816 (Del. Ch. 2007); *CM & M Grp., Inc. v. Carroll*, 453 A.2d 788, 792 (Del. 1982).

[73] *Ceridian Corp.*, 923 A.2d at 817; *CM & M Grp.*, 453 A.2d at 792.

defines a proper purpose as one "reasonably related to such person's interest as a stockholder."[74]  Courts have refused to order inspection where "the shareholder is shown to have possession of all the information that is requested, or where the request is made out of sheer curiosity, unrelated to any legitimate interest of the stockholder, or where the sole purpose of the inspection is to harass the corporation."[75]  "It is settled law in Delaware that valuation of one's shares is a proper purpose for the inspection of corporate books and records. Furthermore, once a proper purpose is established, any secondary purpose or ulterior motive is irrelevant."[76]

When a corporation denies a demand on the basis that the Plaintiff requested inspection under "false pretenses", the corporate defendant bears the burden to prove it.[77] This fact intensive inquiry can be more complex than it appears, and in practice, "difficult to establish."[78]  Where an alternative purpose exists, a stockholder need only show that the purpose is secondary to its primary purpose which is indeed

---

[74] 8 *Del. C.* § 220(b).

[75] *CM & M Grp.*, 453 A.2d at 792.

[76] *Woods Trustee of Avery L. Woods Trust v. Sahara Enterprises, Inc.*, 238 A.3d 879, 892 (Del. Ch. July 22, 2020) (quoting *Radwick Pty., Ltd. v. Medical, Inc.*, 1984 WL 8264, at *1 (Del. Ch. Nov. 7, 1984).

[77] *Ceridian Corp.*, 923 A.2d at 817.

[78] *Id.*

17

proper.[79] A stockholder will not lose its statutory right of inspection, even if the secondary purpose is improper for the sake of the statute.[80]

Here, Plaintiff's demand seeks inspection of books and records for the following reasons:

1. To value his interest in the Company;
2. To investigate possible wrongdoing or mismanagement by the Company's officers and directors in connection with certain statements or misstatements in the Company's October 23, 2021 Private Placement Memorandum ("PPM") and/or Business Plan regarding the status of the Company's relationship with MITO Corporation ("MITO"); investigate possible wrongdoing or mismanagement related to the PPM and Business Plan's representations, director and officer compensation, alleged self-dealing, deviation from the PPM and Business Plan, delay in developing the Power Pack, and to facilitate communications with other stockholders.
3. To investigate possible wrongdoing or mismanagement by the Company's officers and directors in connection with the removal of Mr. Stock as a director of the Company;
4. To investigate possible wrongdoing or mismanagement by the Company's officers and directors in connection with self-dealing transactions and the diversion of corporate assets for the payment of, among other things, inflated salaries and compensation to Company officers and employees;
5. To investigate possible wrongdoing or mismanagement by the Company's officers and directors in connection with the Company's communications, and lack of communications, with existing and potential investors;
6. To investigate possible wrongdoing or mismanagement by the Company's officers and directors in connection with the Company's divergence from its business plan as described in the PPM;

---

[79] *Id*.

[80] *Id*. (*citing Sutherland v. Dardanelle Timber Co.*, 2006 WL 1451531, at *8 (Del.Ch.)

7. To investigate possible wrongdoing or mismanagement by the Company's officers and directors in connection with the Company's potential impending breach of its Exclusive Distribution and Business Collaboration Agreement with Dongguan City Gonghe Electronics Co. Ltd. ("Gonghe Electronics");

8. To investigate possible wrongdoing or mismanagement by the Company's officers and directors in connection with the delay and failure to complete development of its alternative energy Power Packs and other key products; and

9. To facilitate communications with other stockholders concerning the matters identified in paragraphs 1 through 8 above.[81]

"Delaware law does not require that a stockholder establish both a purpose for seeking an inspection and an end to which the fruits of the inspection will be put."[82] However, if a stockholder does say what he will do with it, "then a court can take those uses into account."[83]  Here, the Plaintiff has identified their purposes and what they plan to do, so I will consider their use where appropriate.

Although the Plaintiff identified nine purposes in his demand, the purposes can be curtailed to identify three separate primary purposes for his request.  First, he seeks to value his shares in SETI.  Second, Plaintiff seeks to investigate possible wrongdoing and mismanagement.  Finally, Plaintiff wishes to communicate with other shareholders.

---

[81] JX 208.

[82] *Sahara Enterprises, Inc.*, 238 A.3d at 891.

[83] *Amerisourcebergen*, 2020 WL 132752, at *13.

### 1. Valuing Shares

Plaintiff has proven by a preponderance of the evidence that he seeks to value his shares in SETI. According to Plaintiff, his "number one" reason for seeking to inspect books are records was because he had "a lot of money in [SETI]" as its "founding investor."[84] Additionally, Plaintiff was concerned about the rapid increase in share value.[85] That is, Plaintiff – an initial investor at fifty cents per share—was troubled that the share price increased to $5.00 per share within a year.[86]

SETI does not refute that Plaintiff's purposes are proper, but rather, they argue that "Plaintiff's stated purposes are pretextual."[87] They contend that where Plaintiff seeks to investigate misleading statements in the PPM and Business Plan regarding SETI's relationship with MITO, his actual purpose is to seek revenge on SETI for not memorializing an exclusive distribution agreement.[88]

---

[84] Tr. 143:16-22.

[85] Tr. 143:19-21.

[86] Tr. 143:19-21 ("And that's highly unusual, especially when you have a company that's not producing any products, selling any products, and getting any revenue"); Tr. 231:9-14("…and you go from $1 to $5 within a year, it's hard for me to get my head around that.").

[87] DOB at 19.

[88] *Id*.

SETI argues that Plaintiff's true purpose is to seek information regarding SETI refusing to enter into an exclusive distribution agreement with MITO.[89] But Plaintiff credibly conceded at trial that he was not interested in pursuing an exclusive distribution agreement any longer.[90] It follows, then, that if Plaintiff's company is not partnering with SETI in any more formal way, and he is no longer a member of their board, that his remaining interest in the company relates to his role as a stockholder. Accordingly, the Company has not proven that Plaintiff's valuation purpose is not his primary purpose and Plaintiff is therefore entitled to books and records essential to valuing his shares in SETI.

### 2. Investigating wrongdoing

"It is well established that a stockholder's desire to investigate wrongdoing or mismanagement is a 'proper purpose.'"[91] Plaintiff "cannot satisfy this burden merely by expressing a suspicion of wrongdoing or a disagreement with a business decision."[92] Rather, "[t]o protect the corporation from indiscriminate fishing expeditions and from demands grounded in nothing more than curiosity, [a] mere statement of a purpose to investigate possible general mismanagement, without

---

[89] DOB at 26-27.

[90] *See* Tr. 170:2-4; 229:6-12.

[91] *Seinfeld v. Verizon Comm., Inc.,* 909 A.2d 117, 121 (Del. 2006).

[92] *Disney*, 2023 WL 4208481 at n.128.

more, will not entitle a shareholder to broad § 220 inspection relief."[93] However, "[a] stockholder is "not required to prove by a preponderance of the evidence that waste and [mis]management are actually occurring. Stockholders need only show, by a preponderance of the evidence, a credible basis from which the Court of Chancery can infer there is possible mismanagement that would warrant further investigation."[94] That burden may be established through "documents, logic, testimony or otherwise, that there are legitimate issues of wrongdoing."[95]

Delaware caselaw is instructive when determining what constitutes *some credible evidence* for the standard. In *Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.* the company released inconsistent press releases which appeared to contain false or misleading information, in conjunction with additional circumstances, Vice Chancellor Parsons found the press releases sufficient to "infer that wrongdoing may have occurred."[96] Additionally, in *Marmon v. Arbinet-Thexchange, Inc.*, the stockholder received information of "pervasive mismanagement" from a member of the board.[97] Unable to offer the testimony by

---

[93] *Amerisourcebergen*, 2020 WL 132752, at *8 (internal quotation marks omitted).

[94] *Verizon*, 909 A.2d at 123 (internal quotation marks omitted).

[95] *Id*.

[96] 2005 WL 1713067, (Del. Ch.).

[97] 2004 WL 936512, at *2 (Del. Ch.).

the source of his information at trial, the stockholder avoided violating the rule against hearsay by not offering the information as proof of the matters asserted, but instead as credible evidence to support a finding that issues of mismanagement were present within the company.[98]

Plaintiff claims potential mismanagement at SETI can be linked to Power Pack's lack of development, divergence from and misrepresentations in the PPM and Business Plan, communications (or lack thereof) with potential investors, self-dealing transactions, significant raises in share prices, and unreasonable compensation packages paid to board members as evidence of wrongdoing.[99] SETI responds by attacking Plaintiff's ability to prove the compensation increases were invalid—Plaintiff's failure to provide expert testimony on the subject.

SETI, like many start-ups, utterly failed to achieve the revenue it originally projected in 2022.[100] But SETI's projections were based on commitments from customers who relied on their advertised business plan and PPM—plans they ultimately abandoned.[101] Although Plaintiff admitted at trial that SETI never used

---

[98] *Id.* at *4.

[99] Compl. ℙℙ 9-29.

[100] Compl. at ℙ 24.

[101] Under its "Go to Market Strategy" section, SETI's business plan states: "SETI has a sales & distribution agreement with MITO, Inc…MITO has a national dealer distribution

the word "exclusive, " Plaintiff's contention that diversion from the plans—absent adequate explanation from the company—is enough to wonder what happened. [102]

Plaintiff also suspects wrongdoing due to self-dealing transactions. At trial, both Lyons and Plaintiff testified that while the company was actively seeking funding to meet certain funding goals, Sanders sold his personal shares to them explaining that he was experiencing personal money issues.[103] In December of 2020, Stock made his initial investment of $500,000 for 1 million shares at $0.50 per share.[104] Between then and January 25, 2021, Stock purchased an additional 100,000 shares at the increased price of $1 per share from Sanders, personally, stating that Sanders told Stock it would "really help [him] out."[105] Stock then purchased an additional 1 million shares directly from the Company at $0.50 per share for

---

network that services two beachhead markets targeted by SETI…MITO will service the $4.7B battery replacement market through its national distribution network." JX 50 at 20; The PPM identifies MITO as a "Sales and Distribution Partner." JX 51 at 12; Potential investors were given the business plan and PPM as a part of SETI's presentation; Tr. 124:15-19; Distribution was an important consideration relative to the success of the company; Tr. 28:17-Tr. 29; Although Plaintiff's briefing focuses on SETI's refusal to adhere to his suggestion and expertise, I am in no way questioning the complicated business decisions of the managers of the Company.

[102] *See* Tr. 124-125; 144; Tr. 160-161; *See generally* Tr. 44-46.

[103]Tr. 15:1-24; Tr. 16:1-17; Tr. 113:15-24; Tr. 114:1-5; JX 14.

[104] JX 3.

[105] Tr. 13:15-24; Tr. 14:1-5; JX 14.

$500,000 on January 27, 2021[106] —in at a total of $1.1 million. Subsequently in July or August of 2021, Lyons also purchased stock directly from Sanders.[107] Lyons purchased 100,000 shares, at yet-another increased price of $2.50 per share, paying Sanders personally $250,000.[108]

Board compensation is another reason Plaintiff suspects mismanagement or wrongdoing. SETI's board continued to express concerns about compensation.[109] Lyons testified that board compensation was also a concern for him.[110] He thought that the compensated board members should be taking less compensation to show investors of their commitment and instead be incentivized by their own investment.[111] He was "frustrated that the first thing [they] did [was] go and try and pay people more"[112] "[E]ven though [they] raised the minimum amount of the

---

[106] JX 15.

[107] Tr. 16:10-15.

[108] Tr. 16:10-15.

[109] Tr. 145:7-13.

[110] Tr. 27:13-20 (I was a little -- I was a lot taken aback at the option table. Right before I invested, it looked like the company had authorized I think a $10 million option pool and then immediately granted the bulk of those options, probably 8 million option shares, mostly to insiders, to themselves, to the folks that were there. And I was surprised at that. I didn't understand why you would do that.).

[111] Tr.31: 15-24; Tr. 32:1-4.; Tr. 54:4-21.

[112] Tr. 54:15-16.

25

round,"[113] he didn't think the Company was "swimming in free cash."[114] Although the board followed the recommendations of the compensation committee, mostly interested board members voted for the salary increases—Fred Solomon, Chris Sanders, and Bill Harrington.[115] The Company argues that Plaintiff provided no expert evidence to refute the compensation committee's figures which were based on comparable salaries.[116]

Given the state of the company, I find that Plaintiff has shown, by a preponderance of the evidence, a credible basis from which to suspect wrongdoing and mismanagement. The constant raise in stock prices, the increases in salary despite any forward progress in production or sales, the self-dealing transactions with the CEO, and the deviations from the original business and marketing plans without suggesting viable alternatives, together, logically meet the very minimal credible basis standard required to survive for suspicion of wrongdoing and mismanagement.

---

[113] Tr. 54:12-13.

[114] Tr. 54:14.

[115] JX 110. Chris Sanders received an increase of $40,000 immediately and then an additional $100,000 with additional capital raises overtime. Fred Solomon was adjusted down $50,000 from $150,000. The committee recognized that he should have received an increase of $50,000 from $150k to $200k, but because he decreased his work hours by 50%, he received an adjusted salary of $100,000, in consideration of the increase. Bill Harrington's salary was not adjusted. JX 69.

[116] JX 72.

### 3. Communicating with Stockholders

A section 220 complaint seeking a stockholder list for communication with other stockholders is rarely denied.[117] And communication with other stockholders about specific matters of corporate concern, has consistently been held to be a proper purpose for a stockholder to obtain a stock list.[118] It is a sufficient defense of a corporation to show that a stockholder list was sought for idle curiosity."[119] Here, Plaintiff describes what he wants to share with other stockholders: information about potential mismanagement and wrongdoing. Accordingly, I am convinced the request is not idle, rather it is a proper purpose.

### B. The Scope of the Inspection

Plaintiff has established a proper purpose under Section 220. Thus, I must determine "the scope of inspection" related to that purpose, which "is a fact specific inquiry" granting "the court [] broad discretion when conducting it."[120] Plaintiff "bears the burden of proving that each category of books and records is

---

[117] *Polygon Glob. Opportunities Master Fund v. W. Corp.*, 2006 WL 2947486, at *6 (Del. Ch. Oct. 12, 2006).

[118] *Conservative Caucus Rsch., Analysis & Educ. Found., Inc. v. Chevron Corp.*, 525 A.2d 569, 571 (Del. Ch. 1987).

[119] *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563,570 (Del. 1997).

[120] *Myers v. Academy Sec., Inc.*, 2023 WL 4782948, at *14 (Del. Ch. July 27, 2023) (*quoting Hightower v. SharpSpring, Inc.*, 2022 WL 3970155, at *8 (Del. Ch. Aug. 31, 2022).

essential to accomplishment of the stockholder's articulated purpose for the inspection."[121]

When tailoring the production order, the court must balance the interests of the stockholder and the corporation.[122] "[W]here a § 220 claim is based on alleged corporate wrongdoing, and assuming the allegation is meritorious, the stockholder should be given enough information to effectively address the problem, either through derivative litigation or through direct contact with the corporation's directors and/or stockholders."[123]

When determining the necessary and essential documents, courts have grouped requests into three categories:

• "Formal Board Materials," or "board-level documents that formally evidence the directors' deliberations and decisions and comprise the materials that the directors formally received and considered";

• "Informal Board Materials," which "generally will include communications between directors and the corporation's officers and senior employees, such as information distributed to the directors outside of formal channels, in

---

[121] *KT4 Partners LLC v. Palantir Techs. Inc.*, 203 A.3d 738, 751 (Del. 2019).

[122] *Amerisourcebergen,* 2020 WL 132752, at *24 (citing Sec. First, 687 A.2d at 569).

[123] *Id.*

28

between formal meetings, or in connection with other types of board gatherings"; and

• "Officer-Level Materials," which are "communications and materials that were only shared among or reviewed by officers and employees."[124]

Most often, 220 demands only require Formal Board Materials, but should it prove necessary, an inspection may extend all the way to officer-level materials.[125] Plaintiff's argue that the scope of demand should extend to all-levels of documents, including informal documents such as emails because SETI failed to follow corporate formalities.[126]  SETI argues that Plaintiff waived this request for certain categories of documents by shifting the scope of the documents requested in the pre-trial brief and at trial and that Plaintiff's request seeks information already in his possession.[127]  I disagree.

### 1.     Informal Materials

Plaintiff cites *KT4 Partners LLC v. Palantir Techs. Inc.*, as a basis for his request for the Company to include additional categories of documents, including

---

[124] *Hightower*, 2022 WL 3970155, at *9.

[125] *Amerisourcebergen Corp.*, 2020 WL 132752, at *24.

[126] Op. Br. At 32-34.

[127] Defs. POB at 2.

emails.[128] They argue that *Palantir* and its progeny require the production of emails where there is a meritorious showing that a Company frequently utilized less-formal methods of communication to conduct its business.[129] Under this theory, they assert that the Company only sporadically formalized board actions.[130] Plaintiff offers trial testimony from Lyons who said that Board meetings were "loosely arranged,"[131] Tara Brown's deposition testimony where she admits that SETI possessed the materials to function formally but still communicated through personal emails and sent corporate documents that way.[132] Lastly, Plaintiff offers that the nature of the suspected mismanagement and wrongdoing require the company's informal communications.[133]

Defendant asserts that under *Palantir,* companies who perform traditional business formalities should only need to produce those records and as such, Plaintiff must show a specific need for additional materials.[134] The Company furthers their argument by highlighting the many ways SETI observes corporate formalities. SETI

---

[128] PPB at 5.

[129] *Id*. at 4-7.

[130] PPB at 7.

[131] PPB at 7; Tr. 17:5.

[132] PPB at 9.

[133] PPB at 10.

[134] DPB at 11.

says it held "nearly" monthly board meetings, "prepares and maintains agendas, minutes, resolutions, and written consents."[135] SETI notes that it has the necessary positions in place to conduct corporate formalities, such as a Chief Financial Officer, Corporate Secretary, and Treasurer. SETI even employs a third party, Clear Trust, to maintain its corporate records and Quickbooks, for its financial statements.[136] Defendant also asserts that Plaintiff "failed to present evidence" that SETI conducts business without board formalities.[137]

A stockholder may seek the tools to pursue a claim against the company under section 220. The Delaware Supreme Court has at least inferred that the statue permits inspection for this purpose but does so without permitting disruption of the corporations' operations and decision-making.[138] Therefore, Stock's request must strike a balance between the two. Stock's purposes require email's due to the nature of the wrongdoing. Several of the emails submitted to the court involved compensation arrangements, board proposals, conversations around the business plan, PPM, and distribution strategy. It follows then, that wrongdoing in these areas is less likely to be evinced through the company's corporate records if much of that

---

[135] DPB at 12.

[136] DPB at 13.

[137] DPB at 16.

[138] *See Verizon*, 909 A.2d at 121.

discussion occurred informally. While SETI certainly conducted formal board meetings, Lyons credibly testified that much of the questionable decisions occurred outside of those formal meetings.[139] Certainly, Sanders did not offer his private shares to Lyons and Stock in ear shot of the secretary for recording in the board's minutes.[140] Accordingly, to give Plaintiff the ability to achieve section 220's purpose, I must recommend that SETI disclose its emails.

## 2. Unnecessary Documents

In Plaintiff's opening brief, Plaintiff asserts that all the documents requested are necessary and essential.[141] Plaintiff also asks for a wide range of documents because the Company lacked formalities.[142] For each set of Plaintiff's requested "documents and communications" related to each proper purpose, Defendant claims that Plaintiffs have certain documents in their possession. Namely, document set number two "[t]he Company's articles of incorporation and bylaws, including any amendments thereto;" Defendant's point out that those documents were submitted as joint exhibit. Unless there are any unknown amendments, documents set two is not necessary nor essential.

---

[139] Tr 17:5-14.

[140] Tr 16:1-7; Tr. 113:15-24.

[141] POB at 36.

[142] POB at 34.

Document set six requests documents and communication relating to MITO serving as distributor. Because Plaintiff admitted that he no longer desires to be in contract with SETI, they are unnecessary. Likewise, document set ten is unnecessary as it requests communications with potential investors. I find the communications with potential investors are unnecessary as their interest in the investigation of wrongdoing and understanding of the company is speculative since potential investors lack a relevant interest in the Company.

## IV. CONCLUSION

For the foregoing reasons I recommend that SETI give Plaintiff all document sets except numbers two, six, and ten from the Demand. The Plaintiff has established that the remaining category of books and records requested is essential and sufficient to its stated purpose.

This is a final report and exceptions may be taken pursuant to Court of Chancery Rule 144(d)(2). The stay of exceptions entered under the Chancellor's May 9, 2023, reassignment letter is hereby lifted.